Mark M. METTAUER, M.D., Appellant,

v.

Helen NOBLE, Individually and as Independent Executrix of the Estate of Anthony M. Noble, Deceased, Alexandria Noble Barcak, Sasha Noble, Danielle Heller, and Vanessa Noble, Appellees.

No. 01–10–00167–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Sept. 30, 2010.

James B. Edwards, R. Gregg Byrd, Edwards & Associates, Stafford, for Appellant.

Lynn J. Klement, Law Office of Lynn J. Klement, Angleton, for Appellee.

Panel consists of Justices JENNINGS, ALCALA, and SHARP.

## OPINION

TERRY JENNINGS, Justice.

In this interlocutory appeal,[1] appellant, Mark M. Mettauer, M.D., challenges the trial court's order denying his motion to dismiss the health care liability claim[2] of appellees, Helen Noble, individually and as independent executrix of the estate of Anthony M. Noble, deceased, Alexandria Noble Barcak, Sasha Noble, Danielle Heller, and Vanessa Noble (collectively, the "Nobles"). In two issues, Dr. Mettauer contends that the trial court erred in finding that the Nobles' expert report, written by Dr. Joseph Carey, is sufficient, determining that Dr. Carey is a qualified expert,[3] and not dismissing the claim. The Nobles contend that Dr. Mettauer has brought this appeal "only to delay the trial and increase the cost" of the case, and they seek sanctions for his bringing of a frivolous appeal.[4]

We affirm.

## Background

In their original petition, the Nobles, asserting a health care liability claim against Dr. Mettauer, allege that he, while conducting a thoracoscopic atrial ablation on the decedent, and unable to visualize a catheter, negligently continued with the procedure and "tore a hole in the right atrial-inferior vena-cava junction of the [decedent's] heart." Dr. Mettauer then, instead of a "medial sternotomy incision," performed a "right posterolateral thoracotomy to open the [decedent's] chest and repair the injury," causing an "extensive period of time before blood flow could be reestablished to [the decedent's] body and organs." The lack of blood flow caused "catastrophic multiple organ failure," which resulted in death.

The Nobles timely served Dr. Mettauer with the expert report of Dr. Joseph S. Carey, who opined that the standard of care for thoracoscopic surgery generally requires a surgeon to "visualize through the camera the catheter used during the procedure" and Dr. Mettauer deviated from the standard of care by continuing "with the thoracoscopic ablation procedure when he could not visualize the blue catheter." The deviation "in reasonable medical probability resulted in the injury to the [decedent's] inferior vena cava right atrial junction." Dr. Carey further opined that after the injury, the standard of care called for Dr. Mettauer "to immediately convert the procedure from a thoracoscopic procedure to an open procedure," which requires a surgeon "to open the chest using a median sternotomy incision, which allows more direct visualization of the heart and the injury." Dr. Mettauer deviated from

1. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(9) (Vernon 2008).

2. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351 (Vernon Supp.2010).

3. *See id.*

4. *See* TEX.R.APP. P. 45.

the standard of care when he converted to a "right posterolateral thoracotomy" because such a procedure "takes longer" and "does not allow full visualization" of the heart. Use of the procedure caused the decedent to be "without blood supply to his vital organs for a critical period of time," rather than the "few minutes" that would have passed had Dr. Mettauer used the open procedure. This delay, "in reasonable medical probability," caused the decedent's "catastrophic multiple organ failure that resulted in his death."

Dr. Mettauer objected to Dr. Carey's report on the ground that Dr. Carey "does not perform the thora[co]scopic cardiac ablation procedure at issue," making him unqualified to opine on the standard of care for the procedure. Dr. Carey's conclusions that the "right posterolateral thoracotomy unnecessarily caused the decedent to go without blood supply" and that this ultimately caused his death were based on "assumptions and/or mistakes," not the decedent's medical records. Also, Dr. Carey's "proximate cause conclusion" did not "provide necessary underlying facts regarding the alleged causal relationship" between the "right posterolateral thoracotomy and Mr. Noble's death."

In response to Dr. Mettauer's objections, the Nobles timely served upon him Dr. Carey's amended expert report in which he stated that he had reviewed the decedent's records from St. Luke's Hospitals in the Woodlands and Houston, Dr. Mettauer, and Dr. Frank D. Reichmann. Dr. Carey clarified that he had performed "many thoracoscopic surgical procedures" but had only "performed the atrial ablation procedure with the open technique." He opined that the standard of care for thoracoscopic surgery is the same for "an ablation as for other cardiovascular surgery." Dr. Carey clarified that the decedent had

been subjected to a "period of 13 minutes between the onset of the bleeding and the opening of the chest" and that blood flow, in reasonable probability, could have been "re-established within 2–3 minutes" had Dr. Mettauer used the "open procedure" to open the decedent's chest. He opined that "had the blood flow been re-established within such time, [the decedent] would not, in reasonable medical probability, have suffered the catastrophic multiple organ failure that resulted in his death."

Dr. Mettauer lodged the same three objections that he had made against Dr. Carey's original report and asserted his "[section] 74.351" [5] motion to dismiss the Nobles' health care liability claim. Dr. Mettauer claimed that Dr. Carey's (1) proximate cause opinion depended upon a loss of blood supply that did not occur based on the medical records that established that "Mr. Noble never lost blood pressure and thus never lost blood supply"; (2) thoracoscopic standard of care opinion is based upon "his lack of experience with the surgery at issue"; and (3) atrial proximate cause opinion is based upon "an assumption that is not supported by the medical records (or by the discovery)," which shows that "the Flex View special camera adaptor" created the injury and not an "unsupervised blue catheter." Dr. Mettauer asserted that "Dr. Carey's amended expert report cannot be sufficient if the operative facts within it are wrong or if the critical opinions within it are conclusory." He asked the trial court to consider "whether [the decedent's] medical records and the discovery ... show that the operative facts" within Dr. Carey's expert report "are wrong" and that his opinions are conclusory. Dr. Mettauer attached to his motion the decedent's "anesthesia record" from St. Luke's

---

5. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351.

Hospital in the Woodlands, the "report of procedure" from St. Luke's Hospital in Houston, a PowerPoint presentation allegedly showing how to use the "Guidant Flex 10 Microwave Surgical Ablation System" used during the ablation, and his own answers to interrogatories (collectively, the "source material"). Dr. Mettauer also filed motions to stay discovery and for continuance while his interlocutory appeal of the trial court's order is pending.

In their response to Dr. Mettauer's objections, the Nobles asserted that Dr. Mettauer was asking the trial court to "consider extraneous evidence as to whether the opinion in the report" was accurate instead of looking "only within the four corners" of the report to determine its sufficiency. They countered that Dr. Carey could "rely on matters not in the medical records to support his opinions" and "the minutes of delay resulting from using a posterolateral technique" caused the multiple organ failure that ultimately killed Mr. Noble. The report outlined the standard of care and "inform[ed] [Dr. Mettauer] of the specific conduct called into question, how [the standard of care] was breached, and how that breach caused Mr. Noble's injuries."

In their response to Dr. Mettauer's motion to dismiss, the Nobles asserted that his attached source material is "extrinsic evidence which cannot be considered in determining whether an expert report is adequate." The Nobles labeled Dr. Mettauer's motion a "motion for summary judgment" because he sought to use evidence from the medical records and discovery to "prove Dr. Carey's opinions are wrong" instead of challenging whether Dr. Carey's "report meets the criteria for an expert report."[6] Additionally, they asserted that Dr. Mettauer's motion was based on his attorneys' "interpretation of what [the anesthesia report] means," not

any "expert testimony," and the "medical literature" relied upon had not been "established as authoritative by any expert."

## Standard of Review

■ We review a trial court's decision on a motion to dismiss a health care liability claim for an abuse of discretion. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 875 (Tex.2001) (predecessor statute); *Gray v. CHCA Bayshore L.P.,* 189 S.W.3d 855, 858 (Tex.App.-Houston [1st Dist.] 2006, no pet.). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *See Garcia v. Martinez,* 988 S.W.2d 219, 222 (Tex.1999). When reviewing matters committed to the trial court's discretion, we may not substitute our own judgment for that of the trial court. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex. 2002). A trial court does not abuse its discretion merely because it decides a discretionary matter differently than an appellate court would in a similar circumstance. *Gray,* 189 S.W.3d at 858; *Harris County Hosp. Dist. v. Garrett,* 232 S.W.3d 170, 176 (Tex.App.-Houston [1st Dist.] 2007, no pet.).

## Expert Report

In two issues, Dr. Mettauer argues that the trial court erred in denying his motion to dismiss the Nobles' health care liability claim because "not requiring the facts affecting the standard of care, breach, proximate cause, and damages in the expert report to be reliable permits impermissibly absurd results," Dr. Carey was not qualified to opine on the standard of care applicable to a thoracoscopic atrial ablation procedure, and the trial court "should have taken notice of Dr. Mettauer's source ma-

---

6. *See id.* § 74.351.

terial" in determining the sufficiency of Dr. Carey's expert report and qualifications.

### Sufficiency of Expert Report

A plaintiff bringing a health care liability claim must provide each defendant health care provider with an expert report. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351 (Vernon Supp.2010); *Gray,* 189 S.W.3d at 858. The expert report must provide a fair summary of the expert's opinions as of the date of the report regarding the applicable standards of care, the manner in which the care rendered by the health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6).

If a defendant files a motion to dismiss challenging the adequacy of the expert report, the trial court shall grant the motion to dismiss only if it appears to the court, after a hearing, that the report does not represent an objective good-faith effort to comply with the definition of an expert report. *Id.* § 74.351(b), (*l*). The only information relevant to the inquiry is that within the four corners of the document. *Palacios,* 46 S.W.3d at 878. Although the plaintiff need not marshal all of her proof in the report, the report must include the expert's opinion on each of the elements identified in the statute. *See Palacios,* 46 S.W.3d at 878–79; *Gray,* 189 S.W.3d at 859. In setting out the expert's opinions, the report must provide enough information to fulfill two purposes to constitute a good-faith effort. *Palacios,* 46 S.W.3d at 879. First, the report must inform the defendant of the specific conduct the plaintiff has called into question. *Id.* Second, the report must provide a basis for the trial court to conclude that the claim has merit. *Id.* A report that merely states the expert's conclusions does not fulfill these two purposes. *Id.* The expert must explain the basis of his statements to link his conclusions to the facts. *Bowie,* 79 S.W.3d at 52. However, a plaintiff need not present evidence in the report as if she were actually litigating the merits. *Palacios,* 46 S.W.3d at 879. Furthermore, the report may be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary judgment proceeding or trial. *Id.*

Dr. Mettauer argues that because Dr. Carey's report is "counterfactual" and "factfree," the trial court should have considered Dr. Mettauer's "source material contradicting the facts affecting standard of care, breach, proximate cause, and damages," which the Nobles "failed to reasonably question." Dr. Mettauer asks this Court to hold that "when checking the specific medical facts cited by the expert," a trial court should be allowed to "look in the medical records cited by the expert" rather than restrict its review to the four corners of the expert report and curriculum vitae in determining the sufficiency of the expert report. He asserts that the trial court was required to take judicial notice of "specific medical facts affecting standard of care, breach, proximate cause, and/or damages" that he supplied with his source material.

In support of his argument, Dr. Mettauer relies on *Baptist Hospitals of Southeast Texas v. Carter,* No. 09–08–00067–CV, 2008 WL 2917109, at *3 (Tex.App.-Beaumont July 31, 2008, no pet.) (mem. op). In *Carter,* the plaintiff contended that the absence of an operative report from his first surgery impeded diagnosis and delayed proper corrective surgery. *Id.* The defendant-hospital introduced two "operative reports," which had been reviewed by the expert in writing his report, to support its objection that the expert's report "inad-

equately explained how the alleged delays in [the plaintiff's] treatment were attributable to the absence of a report on the first surgery." *Id.* at *3. The court of appeals stated, "While a court cannot go outside the expert's report in order to supply information that is statutorily required to be within it, the challenge in this case addresses whether the opinions in the expert's report are supported by the facts reflected in the medical records the expert has relied upon to render a report." *Id.* at *3 n. 4. The court went on to consider in its sufficiency analysis the two records presented by the defendant-hospital for the trial court's review, and the court concluded that the expert report based "its causation analysis on several assumptions about [the plaintiff's] treatment at [the defendant-hospitals] that are inconsistent with the medical records placed in evidence." *Id.* at *5. The court further concluded that the operative report from the second surgery referred to the first surgery and adequately made the surgeon aware of the complications from the first surgery. *Id.* at *6. The court held that the expert report did not "sufficiently explain how not having a report on the first surgery delayed [the plaintiff's] treatment and resulted in his injury" and, thus, was conclusory. *Id.*

■ The Nobles assert that any review of the source material, which is outside the four corners of Dr. Carey's report, violates the "four corners" rule of *Palacios.* 46 S.W.3d at 878. We agree. First, Dr. Mettauer, unlike the plaintiff in *Carter,* does not assert that Dr. Carey relied on the source material in writing his expert report. A court of appeals may not engage in a review of documents not relied

upon by an expert. *Christus Health Se. Tex. v. Broussard,* 306 S.W.3d 934, 939 (Tex.App.-Beaumont 2010, no pet.) ("Because [the] defendants' motion asked the trial court to look beyond the four corners of the report and determine fact issues based on an affidavit and documents not reviewed or relied on by the expert, the trial court did not abuse its discretion in denying the motion to dismiss"); *see also In re Windisch,* 138 S.W.3d 507, 511 (Tex. App.-Amarillo 2004, no pet.) (per curiam) (refusing to consider record of hearing and expert's testimony in considering adequacy of expert report).[7]

■ Second, in the context of a health care liability claim, the trial court's role is not to determine the truth or falsity of the expert's opinion but to act as a gatekeeper. *Pedroza v. Toscano,* 293 S.W.3d 665, 667 (Tex.App.-San Antonio 2009, no pet.); *Schmidt v. Dubose,* 259 S.W.3d 213, 218 (Tex.App.-Beaumont 2008, no pet.); *see also E.I. du Pont de Nemours & Co., Inc. v. Robinson,* 923 S.W.2d 549, 558 (Tex. 1995). Here, the trial court was specifically restricted to determining whether Dr. Carey's expert report "represent[ed] a good-faith effort to comply with the definition of an expert report," that is, whether it informed Dr. Mettauer of the specific conduct called into question, provided a basis for the trial court to conclude that the Nobles' claim has merit, and explained the basis of Dr. Carey's statements to link his conclusions to the facts. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(b), (*l*); *Bowie,* 79 S.W.3d at 52; *Palacios,* 46 S.W.3d at 878.

Third, the Beaumont Court of Appeals has, since it issued its opinion in *Carter,* issued a recent opinion clarifying that a

---

7. *See also Hamilton v. Durgin,* No. 10–08–00146–CV, 2008 WL 4816624, at *1 (Tex. App.-Waco Nov. 5, 2008, no pet.) (mem. op.) (holding that defendants attempted to argue merits of claim by asking court to review documents and information outside the expert reports in determining the sufficiency of the reports).

challenge to the sufficiency of an expert report is limited to the four corners of the expert report. *Broussard,* 306 S.W.3d at 939. In *Broussard,* the court held that, despite inconsistencies between assertions made in a plaintiff's expert report and those made in a defendant's motion to dismiss, a trial court may not look beyond the four corners of the expert report to determine whether the facts asserted in the report are false. *Id.* ("Because defendants' motion asked the trial court to look beyond the four corners of the report and determine fact issues based on an affidavit and documents not reviewed or relied on by the expert, the trial court did not abuse its discretion in denying the motion to dismiss."). The court in *Broussard* clearly noted that extraneous information, which was not relied upon by an expert in making his determinations and which does not appear in the report, may not be reviewed in determining the sufficiency of an expert report. *Id.*

Finally, we find no support in Texas Supreme Court authority that the trial court's review of the sufficiency of an expert report may include documents outside the four corners of the expert report and the expert's curriculum vitae. Accordingly, we conclude that the trial court did not err in declining to review Dr. Mettauer's source material in its review of Dr. Carey's expert report.

We review the sufficiency of Dr. Carey's report looking at the four corners of the report. *See Palacios,* 46 S.W.3d at 878. Dr. Carey explained that the standard of care required Dr. Mettauer to stop the thoracoscopic atrial ablation when he could not "visualize the blue catheter" and to convert to a "medial sternotomy incision" to open the decedent's chest after the injury. Dr. Carey identified the specific acts of Dr. Mettauer that were negligent: continuing the procedure when he could not visualize the catheter, resulting in the tear

in the artery, and converting to a posterolateral thoracotomy to open the chest. The report put Dr. Mettauer on notice that his use of the posterolateral thoracotomy, instead of the "open procedure," delayed restoration of the blood supply to multiple organs, which subsequently failed and caused Mr. Noble's death. Accordingly, we hold that the trial court did not err in finding Dr. Carey's expert report sufficient.

### Dr. Carey's Qualifications

In regard to an "expert report" in a health care liability claim, an "expert," "giving opinion testimony about the causal relationship between [an] injury, harm, or damages claimed and [an] alleged departure from the applicable standard of care," must be "a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence." TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(5)(C). Under the Texas Rules of Evidence, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX.R. EVID. 702; *see also Broders v. Heise,* 924 S.W.2d 148, 153 (Tex.1996).

■■■ In regard to the qualifications of an expert witness on causation in a health care liability claim against a physician, the expert witness must be a physician and "otherwise qualified to render opinions on [causation] under the Texas Rules of Evidence." TEX. CIV. PRAC. & REM.CODE ANN. § 74.403(a) (Vernon 2005). On the issue of whether a physician departed from accepted standards of medical care, a person may qualify as an expert witness only if the person is a physician who:

(1) is practicing medicine at the time such testimony is given or was prac-

ticing medicine at the time the claim arose;

(2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

*Id.* § 74.401(a) (Vernon 2005). If a witness is to be qualified on the basis of training or experience, "the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness ... (1) is board certified ... and ... is actively practicing medicine in rendering medical care services relevant to the claim." *Id.* § 74.401(c). An expert report by a person not qualified to testify does not represent a good-faith effort to comply with the definition of an expert report. *Foster v. Zavala,* 214 S.W.3d 106, 116 (Tex.App.-Eastland 2006, pet. denied) (citing *In re Windisch,* 138 S.W.3d at 511 (interpreting predecessor statute to section 74.351)).[8]

▌ Dr. Mettauer first asks this Court to look outside the four corners of the expert report and curriculum vitae and rely on his source materials to conclude that Dr. Carey is unqualified to opine on the issue of standard of care. Again, however, our analysis of the qualifications of an expert is limited to the "four corners of the expert's report and curriculum vitae." *Mem'l Hermann Healthcare Sys. v. Burrell,* 230 S.W.3d 755, 758 (Tex.App.-Houston [14th Dist.] 2007, no pet). Thus, the source material is not relevant to a qualifications inquiry. Instead, the analysis is confined to Dr. Carey's expert report and curriculum vitae. *Id.*

▌ Dr. Mettauer next argues that because Dr. Carey has "no experience with the thoracoscopic atrial ablation surgery," his opinion that "the standard of care regarding thoracoscopic surgery as it relates to the [decedent] is the same whether the thoracic surgeon is performing an ablation or other cardiovascular surgery using the thoracoscopic technique" is conclusory. He asserts that the Nobles failed to challenge his source material, specifically the PowerPoint presentation, as "unreliable" and the presentation shows that Dr. Carey is not qualified to give an opinion about the thoracoscopic cardiac ablation procedure.

However, as identified in his expert report, Dr. Carey's credentials include board certifications in surgery and thoracic surgery and private practice for twenty-seven years as a cardiovascular and thoracic surgeon, the area of medicine relevant to the Nobles' claim. He is "very familiar with general thoracoscopic surgical techniques." In his practice, he routinely performs thoracic surgical procedures that involve a thoracoscope, but he has never performed the cardiac ablation procedure using the thoracoscopic technique, which is the procedure at issue.

Dr. Mettauer next asserts that Dr. Carey had to have "familiarity with the medical procedure at issue" to be qualified. *See Forrest v. Danielson,* 77 S.W.3d 842, 848 (Tex.App.-Tyler 2002, no pet.). In *Forrest,* the expert, whom the court found was not qualified, was board certified in orthopedic surgery, which deals with injuries to the skeletal system. *Id.* However, his expert report and curriculum vitae did not indicate that he was familiar with the procedures that the defendant-doctor had used to access the plaintiff's spine or to remove the disc protrusion or the treatment of a disc protrusion. *Id.* Here, in

**8.** *See also CHCA Mainland, L.P. v. Dickie,* No. 14–07–00831–CV, 2008 WL 3931870, at *3 (Tex.App.-Houston [14th Dist.] Aug. 21, 2008, no pet.) (mem. op.).

contrast, Dr. Carey, while not having performed an atrial ablation using the thoracoscopic procedure, has in fact performed numerous atrial ablations using the "open procedure," and he routinely performs thoracoscopic cardiothoracic procedures. He is also a board certified thoracic surgeon who is currently practicing.

The facts presented here are more similar to those in *Moore v. Gatica*, 269 S.W.3d 134, 141–42 (Tex.App.-Fort Worth 2008, pet. denied). In *Moore*, an expert was board certified in thoracic surgery and had a practice covering "all aspects" of general, thoracic, and cardiovascular surgery. *Id.* at 142. Though the expert report did not indicate that he had experience performing the "laparoscopic appendectomy" at issue, the court concluded that he was qualified to offer an opinion on the standard of care for the treatment of appendicitis because his practice "solely focused on surgery" and he cared "for patients with appendicitis." *Id.* at 141–42. Like the expert in *Moore*, Dr. Carey has an extensive background in cardiothoracic surgery that includes the routine use of thoracoscopes, and he has experience performing atrial ablations. Thus, he had knowledge of the accepted standards of care for a thoracoscopic atrial ablation. Accordingly, we hold that the trial court did not err in finding that Dr. Carey is a qualified expert on the issue of the standard of care.

Having held that the trial court did not err in finding that Dr. Carey is a qualified expert on the issue of the standard of care and that his report is sufficient, we overrule Dr. Mettauer's two issues.

## Sanctions

The Nobles argue that we should assess sanctions against Dr. Mettauer for bringing a frivolous appeal because "no case law supports [his] reliance upon extraneous evidence to attack the adequacy of [Dr. Carey's] report," he failed to "expend the effort to authenticate the information he relied upon" or to provide expert testimony in support of his assertions, and Dr. Mettauer brought this appeal "only to delay the trial and to increase the cost."

After considering the record, briefs, or other papers filed in this Court, we may award a prevailing party just damages if we objectively determine that an appeal is frivolous. TEX.R.APP. P. 45; *Smith v. Brown*, 51 S.W.3d 376, 381 (Tex. App.-Houston [1st Dist.] 2001, pet. denied). An appeal is frivolous when the record, viewed from the perspective of the advocate, does not provide reasonable grounds for the advocate to believe that the case could be reversed. *Smith*, 51 S.W.3d at 381. The decision to grant appellate sanctions is a matter of discretion that an appellate court exercises with prudence and caution and only after careful deliberation. *Id.*

In his appeal, Dr. Mettauer has, contrary to the overwhelming weight of authority, asked us to look outside the four corners of the expert report and to consider his "source material" in evaluating Dr. Carey's qualifications and expert report. Also, Dr. Mettauer's reliance on *Carter* is misplaced, and he did fail to bring the Beaumont Court of Appeals' more recent opinion in *Broussard* to our attention. However, his argument is based on the reasoning expressed in *Carter*, and *Broussard* was not issued until the day before Dr. Mettauer filed his notice of appeal. Exercising prudence and caution, we decline to assess sanctions under these circumstances.

## Conclusion

We affirm the judgment of the trial court.