**Opinion issued July 23, 2019**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-18-00212-CV

———————————

**KELSEY-SEYBOLD MEDICAL GROUP, PLLC D/B/A KELSEY-SEYBOLD CLINIC AND AHMED I. SEWIELAM, M.D., Appellants**

**V.**

**EDDIE LYNN CHEEKS, Appellee**

---

**On Appeal from the 215th District Court**
**Harris County, Texas**
**Trial Court Case No. 2017-53858**

---

## MEMORANDUM OPINION

Appellee Eddie Lynn Cheeks sued appellants Kelsey-Seybold Medical Group, PLLC d/b/a Kelsey-Seybold Clinic and Ahmed I. Sewielam, M.D., asserting healthcare liability claims governed by Chapter 74 of the Civil Practice and Remedies Code. In compliance with section 74.351, Cheeks timely served the

expert report of Harry F. Hull, M.D. The Kelsey-Seybold Clinic and Dr. Sewielam objected to the report and asserted that it was deficient on multiple grounds, including that Dr. Hull is not qualified to render an expert opinion on the standards of care pertaining to the Kelsey-Seybold Clinic and to Dr. Sewielam and that Dr. Hull's standard-of-care opinions are inadequate. The trial court overruled the Kelsey-Seybold Clinic's and Dr. Sewielam's objections, and this interlocutory appeal ensued.

In their sole issue, the Kelsey-Seybold Clinic and Dr. Sewielam assert that the trial court abused its discretion in finding that Dr. Hull's expert report satisfies section 74.351. We agree and reverse the trial court's order.

## Background

The medical records are not before us, and we accept the factual statements in Dr. Hull's expert report for the limited purpose of this appeal. *See Marino v. Wilkins*, 393 S.W.3d 318, 320 n.1 (Tex. App.—Houston [1st Dist.] 2012, pet. denied).

Cheeks, a then-68-year old woman with chronic low back pain, received three epidural spinal injections of corticosteroids for treatment of her low back pain from Dr. Sewielam at the Kelsey-Seybold Clinic. The dates of these injections were December 7, 2015, December 28, 2015, and February 23, 2016. Both of the December injections were at the L4-L5 intervertebral space, while the February 23,

2016 injection was at the L5-S1 intervertebral space. On February 28, 2016, Cheeks was admitted to St. Luke's Medical Center after being found unresponsive at home.

At St. Luke's, Cheeks was found to have an elevated white blood cell count of 32,400 with 80% neutrophils, and she was started on intravenous antibiotics. A spinal tap was performed on February 29. Cheeks's spinal fluid had a low glucose content at 45, elevated protein at 188, and an elevated number of white blood cells at 2218, but no organisms were seen on gram stain. Her blood culture taken on February 28 was positive for Streptococcus pneumoniae. Her spinal fluid culture, which had been taken on February 29, was negative. Cheeks was presumed to have S. pneumoniae meningitis and sepsis. On February 29, an MRI found that Cheeks had bilateral paraspinal abscesses at L4-L5. She improved rapidly on antibiotics and was discharged from the hospital on March 9 to continue intravenous ceftriaxone twice a day at home for a total of six weeks.

Cheeks was readmitted to St. Luke's on March 17, 2017, with back pain, recurrent fever, persistent leukocytosis, and a possible new left frontoparietal and temporal stroke. An MRI of the brain was normal. Her blood culture was positive for Acinetobacter baumannii, resistant to ceftriaxone. An MRI of the spine showed that the paraspinous abscess was increasing in size. Cheeks was treated with antibiotics for the positive blood culture and paraspinous abscess, and she had a

laminectomy and drainage of the epidural abscess on March 25. Culture of the pus from the abscess was negative. Cheeks was discharged from St. Luke's on April 1, 2016, to continue three weeks of intravenous antibiotics and rehabilitation at a skilled nursing facility.

Regarding the two infections, Dr. Hull's expert report concludes:

The best explanation for Ms. Cheeks illnesses are that she was affected by a paraspinous/epidural abscess caused by 2 different bacteria, pneumococcus and Acinetobacter. The pneumococcus spread from the abscess to her blood, causing sepsis, and, possibly, to her meninges, causing meningitis. However, because the spinal tap was performed late, it is not possible to definitively determine if she had meningitis or just inflammation of the meninges from the adjacent paraspinous abscess. Ms. Cheeks responded to antibiotic therapy to cure her pneumococcal sepsis and possible meningitis. However, because the antibiotic she was given was not effective against the strain of Acinetobacter in the abscess, the abscess continued to grow into an epidural abscess impinging on her spinal cord. The Acinetobacter eventually spread into her blood, causing sepsis. This required a second hospitalization with antibiotic therapy and surgical intervention to prevent further damage to her spinal cord.

The question then is how Ms. Cheeks acquired this abscess.

After discussing the various possible causes for epidural abscess, Dr. Hull's report states:

[I]t is more likely than not that the contamination occurred at the Kelsey Seybold Clinic where the intraspinal injections were administered to Ms. Cheeks.

The bacterial contamination introduced into Ms. Cheeks' spinal area could only have occurred if the Kelsey Seybold clinic fell below the standard of care for maintaining sterile procedure.

4

Dr. Hull's report concludes with the following summary:

1.	Eddie L. Cheeks was hospitalized and treated with IV antibiotics for pneumococcal sepsis, possible pneumococcal meningitis and paraspinous abscesses in February and March, 2016.

2.	Eddie L. Cheeks was hospitalized and treated for Acinetobacter sepsis and an epidural abscess in March and April, 2016. Her treatment included both IV antibiotics and a laminectomy to drain the abscess and decompress her spinal cord.

3.	The underlying cause of both Ms. Cheeks' hospitalization is an abscess of her spine caused by a combined infection of Streptococcus pneumoniae and Acinetobacter baumannii.

4.	The treatment provided to cure Ms. Cheeks' sepsis, possible meningitis and epidural abscess was both medically necessary and appropriate.

5.	It is more likely than not that the cause of Ms. Cheeks' epidural abscess was bacterial contamination introduced into her spinal area during epidural injections of steroids for pain relief at the Kelsey Seybold Clinic. Such contamination could only have occurred if the staff of the Kelsey Seybold Clinic fell below the standard of care for maintaining sterile procedure in the operating room.

**Chapter 74 Expert Reports**

Section 74.351 of the Texas Medical Liability Act (TMLA) provides that no medical negligence cause of action may proceed until the plaintiff has made a good-faith effort to demonstrate that a qualified medical expert believes that a defendant's conduct breached the applicable standard of care and caused the claimed injury. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(*l*), (r)(6). "[T]he

purpose of the expert report requirement is to weed out frivolous malpractice claims in the early stages of litigation, not to dispose of potentially meritorious claims." *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018) (per curiam).

In arguing that the trial court abused its discretion in finding that Dr. Hull's expert report satisfies section 74.351, the Kelsey-Seybold Clinic and Dr. Sewielam contend that Dr. Hull is not qualified to offer opinions in an expert report in this case and that his report is deficient on the applicable standards of care, their breach, and causation.

### Standard of Review

We review a trial court's ruling on a motion to dismiss for an abuse of discretion. *Id.*; *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001). "A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles." *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). A trial court also abuses its discretion by failing to analyze or apply the law correctly. *See In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135 (Tex. 2004); *see also Methodist Hosp. v. Shepherd-Sherman,* 296 S.W.3d 193, 197 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("Though we may not substitute our judgment for that of the trial court, the

trial court has no discretion in determining what the law is or applying the law to the facts.").

## Qualifications

In a healthcare liability suit, whether an expert witness is qualified to offer an expert opinion under the relevant statutes and rules lies within the trial court's discretion. *Puppala v. Perry*, 564 S.W.3d 190, 202 (Tex. App.—Houston [1st Dist.] 2018, no pet.). The expert's qualifications must appear in the four corners of the expert report or in the expert's accompanying curriculum vitae. *Id.* "An expert report by a person not qualified to testify does not represent a good-faith effort to comply with the definition of an expert report." *Mettauer v. Noble*, 326 S.W.3d 685, 693 (Tex. App.—Houston [1st Dist.] 2010, no pet.).

To qualify as an expert for the purpose of an expert report against a physician, a person must be a physician who:

(1)     is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;

(2)     has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3)     is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

TEX. CIV. PRAC. & REM. CODE § 74.401(a); *see id.* § 74.351(r)(5)(A) (defining "expert" qualified to give opinion on "whether a physician departed from accepted

7

standards of medical care" as "an expert qualified to testify under the requirements of Section 74.401").

Section 74.401(c) further provides that in determining whether an expert witness is qualified based on his training and experience, a trial court shall consider whether the witness is "board certified or has other substantial training or experience in an area of medical practice relevant to the claim," and whether he "is actively practicing medicine in rendering medical care services relevant to the claim." *Id.* § 74.401(c)(1)-(2).

The expert must do more than show that he is a physician, but he "need not be a specialist in the particular area of the profession for which testimony is offered." *Owens v. Handyside*, 478 S.W.3d 172, 185 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). The critical inquiry is "whether the expert's expertise goes to the very matter on which he or she is to give an opinion." *Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996); *see Mangin v. Wendt*, 480 S.W.3d 701, 707 (Tex. App.—Houston [1st Dist.] 2015, no pet.). "[T]he applicable "standard of care" and an expert's ability to opine on it are dictated by the medical condition involved in the claim and by the expert's familiarity and experience with that condition." *Lee v. Le*, No. 01-18-00309-CV, 2018 WL 4923938, at *4 (Tex. App.—Houston [1st Dist.] Oct. 11, 2018, no pet.) (mem. op.) (quoting *Barber v. Dean*, 303 S.W.3d 819, 826 (Tex. App.—Fort Worth 2009, no pet.)).

A physician may be qualified to provide an expert report even if his specialty differs from that of the defendant if he "has practical knowledge of what is usually and customarily done by other practitioners under circumstances similar to those confronting the malpractice defendant," or "if the subject matter is common to and equally recognized and developed in *all* fields of practice." *Keo v. Vu*, 76 S.W.3d 725, 732 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).

For a case against a health care provider such as the Kelsey-Seybold Clinic and its employees, section 74.402(b) provides:

> [A] person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person:
>
> > (1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;
> >
> > (2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and
> >
> > (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

TEX. CIV. PRAC. & REM. CODE § 74.402(b); *see id.* § 74.351(r)(5)(B) (defining "expert" qualified to give opinion on "whether a health care provider departed

from accepted standards of health care" as "an expert qualified to testify under the requirements of Section 74.402").

The statute defines "practicing health care" to include "(1) training health care providers in the same field as the defendant health care provider at an accredited educational institution; or (2) serving as a consulting health care provider and being licensed, certified, or registered in the same field as the defendant health care provider." *Id.* § 74.402(a). The statute further provides that, in determining whether a person is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the person "(1) is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; *and* (2) is actively practicing health care in rendering health care services relevant to the claim." *Id.* § 74.402(c) (emphasis added)

The Kelsey-Seybold Clinic and Dr. Sewielam, a pain-management physician, contend that Dr. Hull's report and CV fail to show that he is qualified to provide an opinion on the standards of care applicable to a pain-management physician and to a medical clinic regarding the administration of spinal injections to an adult patient.

10

Dr. Hull's report and CV reflect that he received his medical degree from Johns Hopkins University School of Medicine in 1973, after which he had a residency in Pediatrics at the University of Arizona and a residency in Pediatrics at the University of Washington. Dr. Hull's report and CV also reflect that, between his two residencies, he was an Epidemic Intelligence Service Officer at the Centers for Disease Control, but no description of that training is provided.

Dr. Hull's report summarizes his background and qualifications as follows:

I am licensed to practice medicine by the Minnesota Board of Medical Practice. I am certified by the American Board of Pediatrics and a fellow of the American Academy of Pediatrics. I am on the teaching faculty of the University of Nevada School of Medicine and the Department of Community Health at the University of Nevada, Reno. I am currently teaching infectious disease epidemiology to the medical students at the University of Nevada School of Medicine in Reno. I was an adjunct professor of Pediatric Infectious Diseases at the University of Minnesota School of Medicine and an adjunct professor of Infectious Disease Epidemiology at the University of Minnesota School of Public Health from 2000 to 2012. I was a clinical assistant professor of pediatrics during my time in New Mexico. In my more than 40 years of the practice of medicine, I have concentrated on the field of infectious disease epidemiology, including serving as the State Epidemiologist for the states of Minnesota and New Mexico. My full C.V. is attached.

During my tenure as state epidemiologist in Minnesota and New Mexico, assistant state epidemiologist in New Mexico and as an EIS officer assigned by the Center for Disease Control to the Montana Department of Health, I was responsible for investigating and controlling hundreds of outbreaks of illness caused by a broad variety of viruses, bacteria and parasites. My training as a medical doctor plus my extensive experience in the epidemiological investigation and control of infectious diseases make me fully qualified to render opinions, including on the cause of the illness of Eddie L. Cheeks.

11

Cheeks asserts that, while Dr. Hull "is a pediatrician who has no experience with steroid injections," he is qualified by "his practice, training, and experience as an epidemiologist with 40 years of experience in determining the cause of infectious disease." Cheeks further admits that Dr. Hull has "never practiced in an area of medicine that utilizes steroid injection therapy."

Dr. Hull's report states: "My training as a medical doctor plus my extensive experience in the epidemiological investigation and control of infectious diseases make me fully qualified to render opinions, including on the cause of the illness of Eddie L. Cheeks." This statement is conclusory; it does not demonstrate how his medical training, his being a pediatrician, or his epidemiology experience qualifies him to be familiar with the standards of care applicable to a physician or to a medical clinic regarding the administration of spinal steroid injections in a medical clinic.[1] *See Mangin*, 480 S.W.3d at 709–10. Additionally, his report lacks even the

---

[1]  Epidemiology is defined as "a branch of medical science that deals with the incidence, distribution, and control of disease in a population." *Epidemiology*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/epidemiology (last visited July 8, 2019). "Epidemiology is the field of public health and medicine that studies the incidence, distribution, and etiology of disease in human *populations*. The purpose of epidemiology is to better understand disease causation and to prevent disease in *groups* of individuals." ANN. REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, REFERENCE GUIDE ON EPIDEMIOLOGY 333 (2d ed. 2018) (*available at* 2004 WL 48155), at *2 (emphasis added). "Epidemiology focuses on the question of general causation (i.e., is the agent capable of causing disease?) rather than that of specific causation (i.e., did it cause disease in a particular individual?)." *Id. See generally Daniels v. Lyondell-Citgo Ref. Co.*, 99 S.W.3d 722, 727 (Tex. App.—Houston [1st Dist.] 2003, no pet.) ("Epidemiological studies examine existing populations to attempt to

basic statement that he is familiar with the standards of care applicable to a physician or a medical clinic with respect to the administration of spinal steroid injections.

Nothing in his report or CV establishes that Dr. Hull is an expert in the care relevant to Cheeks's claims against the Kelsey-Seybold Clinic and Dr. Sewielam. Nothing indicates that he has any training or experience with epidural spinal injections, and he does not state that he has ever administered or supervised an epidural spinal injection. Nor does Dr. Hull state that he has ever worked with or supervised the specific types of health care providers (nurses, housekeeping staff, and the staff of the infection-control department) that he implicates in his report. Dr. Hull is not board certified in an area of medicine relevant to the claim, he has not demonstrated any relevant training or experience in the care at issue, and he has not shown that he actively practices medicine in the administration of spinal injections. Finally, Dr. Hull's report and CV do not indicate that he has practiced health care in the field of practice involving the same type of care or treatment as the Kelsey-Seybold Clinic's nurses, housekeeping staff, and infection-control staff. *See* TEX. CIV. PRAC. & REM. CODE § 74.402(b)(1), (c); *Group v. Vicento*, 164

---

determine if there is an association between a disease or condition and a factor suspected of causing that disease or condition. Commentators in this area uniformly acknowledge that epidemiological studies cannot establish that a given individual contracted a disease or condition due to exposure to a particular drug or agent.") (internal citations omitted).

13

S.W.3d 724, 730–32 (Tex. App.—Houston [14th Dist.] 2005, pet. denied); *see also Clint L. Hines, Inc. v. Davis*, No. 09-16-00403-CV, 2017 WL 1326051, at *2 (Tex. App.—Beaumont Apr. 6, 2017, no pet.) (mem. op.).

Cheeks argues that prevention of infection is based on knowledge found throughout medicine. *See, e.g.*, *Keo*, 76 S.W.3d at 732 (noting that physician may be qualified "if the subject matter is common to and equally recognized and developed in *all* fields of practice"). But nothing in Dr. Hull's report supports this argument. *See Mangin*, 480 S.W.3d at 709 ("The report also did not establish or even assert that Dr. Mangin's alleged breaches pertained to a subject matter that is common to and equally recognized and developed in all fields of medical practice, such that no specific cardiological knowledge or experience would be required to offer a relevant opinion.") (citing *Broders*, 924 S.W.2d at 153; and *Keo*, 76 S.W.3d at 732). Additionally, while this court has recognized that "the care and treatment of an open wound and infection are common to and equal in all fields of medicine," *New Med. Horizons, II, LTD. v. Milner*, No. 01-17-00827-CV, 2019 WL 1388359, at *5 (Tex. App.—Houston [1st Dist.] Mar. 28, 2019, no pet.), this line of cases has been limited to the care and treatment of existing open wounds that develop infection. *See id.* at *5 & n.2. We are not aware of any extension of this line of cases to a situation like Cheeks's where the infection is allegedly

14

caused by a spinal steroid injection, and we decline to do so here on the record before us. *See Mangin*, 480 S.W.3d at 709.

In conclusion, because Dr. Hull's report and CV do not establish that he is qualified to provide standard-of-care opinions as to the Kelsey-Seybold Clinic and Dr. Sewielam, the trial court abused its discretion in finding that he was qualified to provide a section 74.351 expert report in this case.

## Standard of Care and Breach

Even if Dr. Hull were qualified, we conclude that the trial court abused its discretion in finding that his opinions on the standards of care and their breach are adequate.

To constitute a good-faith effort, an expert report must provide enough information to fulfill two purposes: (1) inform the defendant of the specific conduct that the plaintiff has called into question; and (2) provide a basis for the trial court to conclude that the claim has merit. *See Baty v. Futrell*, 543 S.W.3d 689, 693–94 (Tex. 2018); *Palacios*, 46 S.W.3d at 878–79. An expert report must provide a "fair summary" of the expert's opinions regarding the (1) applicable standards of care, (2) manner in which the care rendered by the physician or health care provider failed to meet the standards, and (3) causal relationship between that failure and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6); *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510,

15

513 (Tex. 2017) (per curiam). "To adequately identify the standard of care, an expert report must set forth 'specific information about what the defendant should have done differently.'" *Abshire*, 563 S.W.3d at 226 (quoting *Palacios*, 46 S.W.3d at 880).

Regarding the applicable standard of care, Dr. Hull's report first generally states:

> The bacterial contamination introduced into Ms. Cheeks' spinal area could only have occurred if the Kelsey Seybold clinic fell below the standard of care for maintaining sterile procedure. By failing to maintain sterile procedure, bacteria would have been introduced into the medicine injected into Ms. Cheeks' spine.

Dr. Hull then lists possible violations of the standard of care for maintaining sterile procedure, thus providing further specificity of the applicable standards:

> Violations of the standard could include failing to properly clean the operating room, failing to properly wear masks during the procedure, inadequate hand washing, contaminating the surface of the vial containing the medicine to be administered to Ms. Cheeks, contamination [of] the equipment used to administer the injections to Ms. Cheeks or using the same vial of medicine or non-sterile saline for multiple patients.

Dr. Hull's report then concludes:

> Any one of the foregoing could have led to these pathogenic bacteria being introduced into Ms. Cheeks['s] spinal area, producing the abscess. The records do not identify a specific route by which the contamination occurred, but that, per se, does not exclude such contamination occurring.

16

Dr. Hull's report merely lists *possible* violations of the standard of care without stating that any of these possibilities actually occurred during Cheeks's care. He does not identify any particular failure to maintain sterile procedures, nor does he identify the persons responsible for the alleged failure. In short, Dr. Hull's report does not show which Kelsey-Seybold personnel were involved in the alleged breach or if Dr. Sewielam was involved, when the alleged breach occurred, or what sterile procedure they allegedly failed to follow. He admits that he cannot identify "a specific route by which the contamination occurred." Dr. Hull's report does not set forth "specific information about what the defendant should have done differently." *Id.*

Last year, this court found insufficient a similar expert report in a surgical infection case:

> Dr. Nirgiotis had previously identified a number of precautionary techniques and procedures that could prevent the introduction of bacteria into a surgical wound, and stated that the "[f]ailure to take one or more of these precautions was the proximate cause of Mr. Sherman's infection." However, Dr. Nirgiotis does not specify how Dr. Elkousy or Fondren deviated from these protocols, and we are not allowed to draw inferences from the report or speculate as to how Dr. Elkousy and Fondren might have done so. Thus, Dr. Nirgiotis's report is insufficient as to breach because it does not specifically inform Dr. Elkousy or Fondren of the negligent acts, or failures to act, that caused the injury to Sherman.

*Fondren Orthopedic Group, LLP v. Sherman*, No. 01-18-00545-CV, 2018 WL 5915068, at *4 (Tex. App.—Houston [1st Dist.] Nov. 13, 2018, no pet.) (mem. op.)

17

(citations omitted).

Because Dr. Hull's report fails to inform Dr. Sewielam or Kelsey-Seybold of the specific conduct criticized and fails to set out what specific care was expected but not given, it is deficient.[2] *See id.* The trial court abused its discretion in finding the report adequate to be a good-faith effort on the applicable standards of care and their breach.

**Conclusion**

In light of the above determinations, we need not address the appellants' remaining challenges to Dr. Hull's report. *See Iasis Healthcare Corp. v. Pean*, No. 01-17-00638-CV, 2018 WL 3059789, at *8 n.7 (Tex. App.—Houston [1st Dist.] June 21, 2018, pet. denied) (citing *Gardner v. U.S. Imaging, Inc.*, 274 S.W.3d 669, 671 n.2 (Tex. 2008)); TEX. R. APP. P. 47.1.

Cheeks conditionally requested a thirty-day extension to cure Dr. Hull's report under section 74.351(c) in the event that the trial court or this court found his report to be deficient. We will remand this case to the trial court for it to consider and rule on Cheeks's request for a thirty-day extension to cure the deficient report under section 74.351(c). *See Leland v. Brandal*, 257 S.W.3d 204, 207–08 (Tex. 2008); *see also Scoresby v. Santillan*, 346 S.W.3d 546, 549 (Tex.

---

[2] We further conclude that Dr. Hull's report is insufficient as to causation because it does not link Cheeks's injury to a specific breach of a standard of care. *See Fondren Orthopedic Group*, 2018 WL 5915068, at *5.

18

2011) ("An individual's lack of relevant qualifications and an opinion's inadequacies are deficiencies the plaintiff should be given an opportunity to cure if it is possible to do so."); *Lewis v. Funderburk*, 253 S.W.3d 204, 208 (Tex. 2008) (stating that thirty-day extension can be used to serve new report from different expert); *Baylor Coll. of Med. v. Pokluda*, 283 S.W.3d 110, 116 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (same).

We reverse the trial court's order and remand this case to the trial court for it to consider and rule on Cheeks's request for a thirty-day extension.


Richard Hightower
Justice

Panel consists of Justices Lloyd, Kelly, and Hightower.