**Opinion issued April 16, 2024**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-23-00602-CV

————————————

**GARY HORNDESKI M.D., Appellant**

**V.**

**CHERYL PRICE, Appellee**

On Appeal from the 239th District Court
Brazoria County, Texas
Trial Court Case No. 111019-CV

## MEMORANDUM OPINION

This is an interlocutory appeal from the denial of a motion to dismiss pursuant to Chapter 74 of the Texas Practice and Remedies Code in a health care liability suit. Appellee Cheryl Price sued Appellant Gary Horndeski M.D. for negliegnce arising from the breast reconstruction surgery he performed on her. On appeal, Dr.

Horndeski argues the trial court abused its discretion by denying his motion to dismiss because (1) Price's expert report fails to provide a sufficient opinion on the applicable standard of care and breach of that standard, and (2) her expert report does not causally link Price's damages to any specific breach of an applicable standard of care. Dr. Horndeski argues that because Price is not entitled to an opportunity to cure these deficiencies, we must reverse and remand the matter to the trial court to award him his reasonable attorney's fees and costs.

We affirm the trial court's order.

## Background[1]

Appellee Cheryl Price suffered from left breast cancer in 1995. She had "bilateral mastectomies followed by delayed breast cancer reconstruction with implants in 1999." She subsequently "developed an exposure and had the bilateral implants removed." She alleges in her petition that in 2019, she "presented to Dr. Horndeski for care and treatment to remove excess skin under each arm after [her] breast cancer surgery . . . ." On March 5, 2019, Dr. Horndeski performed a "Bellasoma" breast reconstruction surgery on Price to remove the excess skin. Price alleges that shortly after the surgical procedure, she developed bilateral blisters and

---

[1] This is the second interlocutory appeal in this suit. The background facts are taken directly from our prior opinion in *Horndeski v. Price*, No. 01-21-00577-CV, 2022 WL 3363951, at *1 (Tex. App.—Houston [1st Dist.] Aug. 16, 2022, no pet.) (mem. op.).

pustules on her skin and infections that required three operative debridements of her breasts, wound care, and oral antibiotic therapy. Price also alleges that following the surgical procedure, there was "evidence of unauthorized complete bilateral breast reconstruction and infection."

**Procedural Background**

On January 4, 2021, Price filed a health care liability suit against Dr. Horndeski alleging he "was negligent in providing appropriate and timely medical care and treatment to [her] while she was his patient and breached his duty to provide the standard of care in restoring and treating [her]." Price alleged Dr. Horndeski was negligent in failing to (1) obtain her consent to perform the subject procedure, (2) meet the standard of care in performing the unauthorized breast reconstruction, (3) make a reasonable attempt to address her high-risk surgical candidacy for breast reconstruction, (4) recognize that his skills, knowledge, or facilities were inadequate to properly treat Price under the circumstances as they then existed, (5) adhere to the acceptable standards for care in the medical profession by performing a "Bellasoma" procedure for breast reconstruction when it was inappropriate, and (6) protect her from possible infection after performing the procedure.

**Original and Supplemental Expert Reports**

Price filed and served upon Dr. Horndeski an original expert report authored by Leo Lapuerta, M.D., F.A.C.S., a board-certified plastic surgeon and Chief of

Plastic Surgery at St. Joseph Hospital ("Dr. Lapuerta"), which she attached as Exhibit A to her petition. On March 8, 2021, Dr. Horndeski objected to Dr. Lapuerta's report arguing it failed to satisfy the requirements of Chapter 74 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(a), (r)(6) (requiring plaintiff asserting health care liability claim to serve health care defendant with expert report providing fair summary of expert's opinions regarding applicable standards of care, breach, and causation).

On June 11, 2021, Price served Dr. Horndeski with a supplemental expert report authored by Dr. Lapuerta. In his Supplemental Report, Dr. Lapuerta discusses his physical examination of Price, including Price's medical history, and he offers the following opinions:

### ACCEPTED STANDARD OF CARE FOR MS. PRICE

In my opinion, Mrs. Price has an extensive and complicated medical and surgical history with a history of healing problems and she was not a candidate for any type of breast reconstruction. She had some type of procedure performed by Dr. Horndeski in March 2019 complicated by multiple infested pustules and required three operative debridements and wound care with oral antibiotic therapy to eventually heal.

### DEPARTURE FROM ACCEPTED STANDARD OF CARE BY DR. HORNDESKI

In my opinion, the procedure recommended and carried out by Dr. Horndeski on March 5, 2019 departed from and was below the accepted standard of care in the following respects:

1.    Mrs. Price was and remains a very high risk surgical candidate which precludes any breast reconstruction.

4

2. The procedure performed consisting of a "bellasoma" reconstruction and explained at www.horndeski.com is not the standard of care in breast reconstruction in the community and led to pustule formation and retained foreign bodies in the breasts which required several more operations by myself, Dr. Kovacev and Dr. Wegge to control.

I have reviewed the aforesaid medical records and based upon my experience and training, it was below the standard of care for the defendant plastic surgeon, Dr. Horndeski, to perform the surgery on Ms. Price. Under reasonable medical probability had he simply refrained from performing the procedure, Ms. Price would not have sustained the disfigurement she complains of and all of the subsequent procedures would have been avoided.

Dr. Horndeski objected to Dr. Lapuerta's Supplemental Report and argued the report failed to satisfy the requirements of Chapter 74 because the report did not provide a fair summary of Dr. Lapuerta's opinions regarding the applicable standards of care, Dr. Horndeski's breach of that standard, and how Dr. Horndeski's breach caused Price's harm. Dr. Horndeski also filed a motion to dismiss with prejudice Price's negligence claim on the same grounds, and he asked the trial court to award him his attorney's fees and costs pursuant to Section 74.351(b) of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(b) (requiring trial court to dismiss plaintiff's health care liability claims with prejudice and award defendant health care provider its attorney's fees and costs when plaintiff fails to timely serve compliant expert report). The trial court denied Dr. Horndeski's motion to dismiss and Dr. Horndeski filed an interlocutory appeal challenging the trial court's ruling.

5

On August 16, 2022, this Court issued an opinion concluding that Dr. Lapuerta's Supplemental Report failed to provide a fair summary of his opinions regarding the applicable standard of care, Dr. Horndski's breach of that standard, and causation. *Horndeski v. Price*, No. 01-21-00577-CV, 2022 WL 3363951, at *6–7 (Tex. App.—Houston [1st Dist.] Aug. 16, 2022) (mem. op.) ("*Horndeski I*"). We remanded the matter to the trial court to determine whether Price should be afforded a thirty-day extension to cure the defects identified in Dr. Lapuerta's report. *Id.* at *7; TEX. CIV. PRAC. & REM. CODE § 74.351(c) (authorizing trial court to grant plaintiff thirty-day extension to cure expert report's deficiencies).

**Amended Report**

On remand, the trial court granted Price a thirty-day extension to cure her report. On October 10, 2022, Price served Dr. Horndeski with an Amended Report, where Dr. Lapuerta provides the following opinions:[2]

ACCEPTED STANDARD OF CARE FOR MRS. PRICE

In my opinion, Mrs. Price has an extensive and complicated medical and surgical history with a history of severe healing problems and she was not a candidate for any type of breast reconstruction. Her past surgical history includes a failed attempt at implant reconstruction, which is one of the standard operations performed in high risk patients

---

[2] The "Personal Examination" section of the Amended Report is identical to the same section in the Supplemental Report with two exceptions. The Amended Report also states Price "developed severe complications of abscess formation, bilateral open breast wounds and required operative debridements on 3/18/19 and 3/28/19" and it states Dr. Lapuerta observed "evidence of *attempted* bilateral breast reconstruction and infections" when he examined Price on May 28, 2019. (Emphasis added).

6

who desire breast reconstruction. Her past surgical history also includes severe complications after colon surgery leading to wound care issues and hernia formation. These complications reduce other autologous tissue options for Mrs. Price such as a TRAM or DIEP flap. She had a procedure performed by Dr. Horndeski in March of 2019 consisting of what he refers to as "bellasoma procedure" which was complicated by multiple infected pustules and required five to six subsequent operative debridements by three other surgeons and wound care with oral antibiotic therapy to eventually heal. Based upon my experience, training, practice and review of literature, the accepted standard of care for a plastic surgeon presented with the history and examination of Cheryl Price as set forth within Dr. Horndeski's records is to perform no reconstructive procedure whatsoever. Additionally, the procedure performed by Dr. Horndeski consisted of a "Bellasoma" reconstruction and is explained at www.horndeski.com. The standard of care operations in breast reconstruction would include implant reconstruction, TRAM flaps or DIEP flaps and latissimus muscle flaps. The "Bellasoma" reconstruction varies from the standard of care and ordinary breast reconstructive surgery and, even if a plastic surgeon was to ignore the standard of care to do nothing, the procedure described and performed by Dr. Horndeski breached the standard of care.

## DEPARTURE FROM ACCEPTED STANDARD OF CARE BY DR. HORNDESKI

In my opinion, the procedure recommended and carried out by Dr. Horndeski on March 5, 2019 departed from and was below the accepted standard of care in the following respect; Mrs. Price was a very high risk surgical candidate which, under the aforesaid standard of care for plastic surgeons, precludes any elective breast reconstruction. Any breast reconstruction under her presentation would be a violation of the standard of care of a plastic surgeon. She had already failed multiple attempts at bilateral breast reconstruction and has a history of severe wound problems after other operations on her body. Mrs. Price stated to me that all she wanted was her dog ears removed from the mastectomies and this was never performed. The standard of care for patients with multiple failed reconstructive attempts, as indicated in the records of Cheryl Price is to do nothing. Additionally, Dr. Horndeski breached the standard of care by performing a "bellasoma" procedure which is an unknown procedure, experimental at best, and not the

7

standard of care in any community. Dr. Horndeski actually refers to the operation in question as the "ultimate" breast lift in his progress notes on 3/18/2019.

CAUSATION

The ill-advised "Bellasoma" reconstructive breast surgery performed by Dr. Horndeski on Cheryl Price led to foreseeable and inevitable multiple infected pustule formation, fat necrosis and retained foreign bodies in the breasts which required two operative debridements by Dr. Horndeski and several more operations by myself, Dr. Kovacev and Dr. Wegge to control. Based upon aforesaid medical records and based upon my experience and training, it was below the standard of care for the defendant plastic surgeon, Dr. Horndeski, to perform the "Bellasoma" surgery on Mrs. Price. Under reasonable medical probability had he simply refrained from performing the procedure, Mrs. Price would not have sustained the disfigurement she complains of and all five of the subsequent procedures would have been avoided.

Dr. Horndeski objected to the Amended Report arguing the report was inadequate as to standard of care, breach, and causation. He filed a motion to dismiss with prejudice Price's negligence claim on the same grounds, and he asked the trial court to award him his attorney's fees and costs. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(b). The trial court denied his motion and this interlocutory appeal followed.

**Discussion**

On appeal, Dr. Horndeski challenges the trial court's order denying his motion to dismiss Price's health care liability claim against him. He argues Dr. Lapuerta's Amended Report is deficient because Dr. Lapuerta does not provide a fair summary of his opinions regarding (1) the applicable standard of care, (2) how Dr. Horndeski

8

breached that standard, and (3) the causal relationship between Dr. Horndeski's alleged breach of the standard of care and the harm to Price.

## A. Standard of Review

We review a trial court's decision on a motion to dismiss a health care liability claim for abuse of discretion. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001). When reviewing matters committed to a trial court's discretion, we may not substitute our own judgment for that of the trial court. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). A trial court does not abuse its discretion merely because it decides a discretionary matter differently than an appellate court would in a similar circumstance. *Harris Cnty. Hosp. Dist. v. Garrett*, 232 S.W.3d 170, 176 (Tex. App.—Houston [1st Dist.] 2007, no pet.). But a trial court has no discretion in determining what the law is or in applying the law to the facts. *See Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010). We conduct our review keeping in mind that Chapter 74 expert reports are required to deter baseless claims, not to block earnest ones. *Scoresby v. Santillan*, 346 S.W.3d 546, 554 (Tex. 2011) ("The purpose of the expert report requirement is to deter frivolous claims, not to dispose of claims regardless of

their merit."). When reviewing decisions for abuse of discretion, "[c]lose calls must go to the trial court." *Larson v. Downing*, 197 S.W.3d 303, 305 (Tex. 2006).

**B.     Applicable Law**

Under the Texas Medical Liability Act, a health care liability claimant must "serve on [each defendant] or the [defendant's] attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted" to substantiate her claims. TEX. CIV. PRAC. & REM. CODE § 74.351(a); *see E.D. by & through B.O. v. Tex. Health Care, P.L.L.C.*, 644 S.W.3d 660, 662 (Tex. 2022); *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018). The statute defines an "expert report" as a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding (1) the applicable standards of care, (2) the manner in which the care rendered by the defendant physician or health care provider failed to meet the standards, and (3) the causal relationship between that failure and the injury, harm, or damages claimed by the plaintiff. TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6); *see E.D. by & through B.O.*, 644 S.W.3d at 662 (citing TEX. CIV. PRAC. & REM. CODE § 74.351(*l*), (r)(6)).

A "fair summary" of the expert's opinions means the report must state more than the expert's mere conclusions on the standard of care, breach, and causation. The report must explain the basis of the expert's opinion so as to link the conclusions

10

to the facts of the case. *See Jelinek*, 328 S.W.3d at 539; *Wright*, 79 S.W.3d at 52. "The fair summary benchmark is not an evidentiary standard, and at this early stage of the litigation, we do not require a claimant to present evidence in the report as if it were actually litigating the merits." *E.D. by & through B.O.*, 644 S.W.3d at 667 (internal quote marks omitted) (quoting *Abshire*, 563 S.W.3d at 226). "Rather, [t]he ultimate evidentiary value of the opinions proffered—that is, whether there actually is a breach and causal connection—is a matter to be determined at summary judgment and beyond. *E.D. by & through B.O.*, 644 S.W.3d at 667 (internal quote marks omitted) (quoting *Abshire*, 563 S.W.3d at 226) (alteration in original).

In assessing the report's sufficiency, the trial court may not draw any inferences; the only information relevant to the inquiry is within the four corners of the document. *In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 463 & n.14 (Tex. 2008); *Palacios*, 46 S.W.3d at 878–79. Although the report need not marshal all the plaintiff's proof, it must include the expert's opinions on the three statutory elements: standard of care, breach, and causation. *Abshire*, 563 S.W.3d at 223 (citing *Palacios*, 46 S.W.3d at 878–79); *Gray v. CHCA Bayshore L.P.*, 189 S.W.3d 855, 859 (Tex. App.—Houston [1st Dist.] 2006, no pet.). Courts must view the report in its entirety, rather than isolating specific portions or sections, to determine whether it is sufficient. *See Baty v. Futrell*, 543 S.W.3d 689, 694 (Tex. 2018) (stating when reviewing sufficiency of expert reports, courts must view report in its

11

entirety); *see also Ortiz v. Patterson*, 378 S.W.3d 667, 671 (Tex. App.—Dallas 2012, no pet.) ("We determine whether a causation opinion is sufficient by considering it in the context of the entire report."); *Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 282 (Tex. App.—Austin 2007, no pet.) ("The form of the report and the location of the information in the report are not dispositive.").

An expert report must be served "not later than the 120th day after the date each defendant's original answer is filed." TEX. CIV. PRAC. & REM. CODE § 74.351(a). To avoid dismissal, the report must provide enough information as to each required element to constitute an "objective good faith effort to comply with the definition of an expert report." *Id.* § 74.351(*l*). First, the report must inform the defendant health care provider of the specific conduct the plaintiff questions or about which the plaintiff complains. *E.D. by and through B.O.*, 644 S.W.3d at 664. Second, the report must provide a basis for the trial court to conclude that the plaintiff's health care claims have merit. *Id.* A report that merely states the expert's conclusions as to the standard of care, breach, and causation does not fulfill these two purposes. *See Scoresby*, 346 S.W.3d at 556. While the expert report need not use any particular words and may be informal, "bare conclusions will not suffice." *Id.*

In reviewing the adequacy of an expert report, a trial court may not consider an expert's credibility, the data relied on by the expert, or the documents the expert

failed to consider at the pre-discovery stage of the litigation. *See Mettauer v. Noble*, 326 S.W.3d 685, 691–92 (Tex. App.—Houston [1st Dist.] 2010, no pet.); *Gonzalez*, 485 S.W.3d at 245; *Gonzalez v. Padilla*, 485 S.W.3d 236, 245 (Tex. App.—El Paso 2016, no pet.). It is not the trial court's job to weigh the report's credibility; that is, the court's disagreement with the expert's opinion does not render the expert report conclusory. *Abshire*, 563 S.W.3d at 226.

If the plaintiff serves a timely expert report and the defendant physician or health care provider files a motion challenging the report's adequacy, the trial court "shall grant [the] motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)."[3] TEX. CIV. PRAC. & REM. CODE § 74.351(*l*); *see Palacios*, 46 S.W.3d at 877. "The purpose of the expert report requirement is to deter frivolous claims, not to dispose of claims regardless of their merit." *Scoresby*, 346 S.W.3d at 554. Section 74.351 was designed to meet that purpose "by requiring a claimant early in litigation to produce the opinion of a suitable expert that his claim has merit." *Columbia*

---

[3]     If an expert report is not served timely "because elements of the report are found deficient, the [trial] court may grant one 30-day extension to the claimant in order to cure the deficiency." TEX. CIV. PRAC. & REM. CODE § 74.351(c). Following remand from this Court's decision in *Horndeski I*, the trial court granted Price thirty days to cure the deficiencies in her report. This appeal stems from the trial court's denial of Dr. Horndeski's motion to dismiss filed after Price filed her Amended Report.

*Valley Healthcare Sys. L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017) (quoting *Scoresby*, 346 S.W.3d at 552). It is "a low threshold" a person asserting a claim "against a health care provider must cross merely to show that his claim is not frivolous." *Loaisiga v. Cerda*, 379 S.W.3d 248, 264 (Tex. 2012) (Hecht, J., concurring and dissenting). Accordingly, the Texas Supreme Court "has encouraged trial courts to liberally construe expert reports in favor of plaintiffs." *Henry v. Kelly*, 375 S.W.3d 531, 535 (Tex. App.—Houston [14th Dist.] 2012, pet. denied).

## C.     Standard of Care and Breach

The standard of care relevant to a healthcare provider is what an ordinarily prudent healthcare provider would do under the same or similar circumstances. *Palacios*, 46 S.W.3d at 880; *Strom v. Mem'l Hermann Hosp. Sys.*, 110 S.W.3d 216, 222 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). "Identifying the standard of care is critical: Whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently." *Palacios*, 46 S.W.3d at 880; *Nw. EMS Consultants, P.A. v. Guillory*, No. 01-19-00668-CV, 2020 WL 4516872, at *7 (Tex. App.—Houston [1st Dist.] Aug. 6, 2020, pet. denied) (mem. op.) (finding expert report conclusory with respect to applicable standard of care where report failed to specifically describe standard of care for transferring patient strapped to stretcher from ambulance to hospital). The standard of care articulated in the expert report, however, "need not

14

be complicated for it to be sufficient." *Keepers v. Smith*, No. 01-20-00463-CV, 2022 WL 2347744, at \*12 (Tex. App.—Houston [1st Dist.] June 30, 2022, pet. denied) (mem. op.) (citing *Baty*, 543 S.W.3d at 697).

For standard of care and breach, the expert report must explain what the defendant physician should have done under the circumstances and what the physician did instead. *Abshire*, 563 S.W.3d at 226 (noting that to identify standard of care adequately expert report must set forth "specific information about what the defendant should have done differently"); *see also Palacios*, 46 S.W.3d at 880 ("The standard of care for a hospital is what an ordinarily prudent hospital would do under the same or similar circumstances."). A report that merely states the expert's conclusions about standard of care and breach is insufficient. *See Palacios*, 46 S.W.3d at 880.

The report must identify the care that should have been given and it must do so with such specificity that inferences are not needed to discern it. *Guillory*, 2020 WL 4516872, at \*7; *see Russ v. Titus Hosp. Dist.*, 128 S.W.3d 332, 342 (Tex.—App. Texarkana, 2004, pet. denied) ("In other words, one must be able to determine from the report what the standard of care required to be done."). A trial court cannot fill in missing gaps in an expert report, draw inferences, or guess what an expert likely meant in his expert report. *Tenet Hosps., Ltd. v. Garcia*, 462 S.W.3d 299, 310 (Tex. App.—El Paso 2015, no pet.); *see also Collini v. Pustejovsky*, 280 S.W.3d 456, 462

15

(Tex. App.—Fort Worth 2009, no pet.) ("When reviewing the adequacy of a report, the only information relevant to our inquiry is the information contained within the four corners of the document. This requirement precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended." (internal citations and footnote omitted)).

Dr. Horndeski argues Dr. Lapuerta's opinions in his Amended Report are "virtually identical to those found deficient by this Court in his Original and Supplemental Reports." According to Dr. Horndeski, Dr. Lapuerta's Amended Report fails to provide a fair summary of his opinions regarding the standard of care applicable to Dr. Horndeski and the manner in which Dr. Horndeski failed to meet that standard. He argues Dr. Lapuerta's opinions, as expressed in the report concerning the applicable standard of care and breach, are conclusory and thus the Amended Report fails to inform Dr. Horndeski of how he breached the standard of care and what Dr. Lapuerta believes Dr. Horndeski should have done differently.

We disagree with Dr. Horndeski's characterization of the Amended Report as "virtually identical" with respect to his opinions on standard of care and breach. In *Horndeski I*, we concluded that Dr. Lapuerta's Supplemental Report was inadequate with regard to standard of care and breach, and we stated:

> In his supplemental expert report, Dr. Lapuerta states that in his opinion, "Mrs. Price has an extensive and complicated medical and surgical history with a history of healing problems and she was not a candidate for any type of breast reconstruction. She had some type of

16

> procedure performed by Dr. Horndeski in March 2019 complicated by multiple infested pustules and required three operative debridements and wound care with oral antibiotic therapy to eventually heal." Dr. Lapuerta then opines that "[t]he procedure performed consisting of a "bellasoma" reconstruction and explained at www.horndeski.com is not the standard of care in breast reconstruction in the community."
>
> These opinions do not articulate a standard of care applicable to a plastic surgeon with respect to breast reconstruction surgery.

We further held Dr. Lapuerta's opinion that "[t]he procedure performed consisting of a 'bellasoma' reconstruction and explained at www.horndeski.com is not the standard of care in breast reconstruction in the community" or that "Price has an extensive and complicated medical and surgical history with a history of healing problems and she was not a candidate for any type of breast reconstruction" "fails to state how the Bellasoma procedure violated any particular standard of care or explain with any level of specificity what Dr. Horndeski should have done differently." *Horndeski I*, 2022 WL 3363951, at *6. We further stated that "Dr. LaPuerta does not explain or give a summary of what Dr. Horndeski should have done under the circumstances or 'what care was expected, but not given.'" *Id.* (quoting *Palacios*, 46 S.W.3d at 880).

In his Amended Report, Dr. Lapuerta reiterates that Price "has an extensive and complicated medical and surgical history with a history of severe healing problems." But, unlike in his Supplemental Report, Dr. Lapuerta adds and explains in his Amended Report that:

17

> [Price's] past surgical history includes a failed attempt at implant reconstruction, which is one of the standard operations performed in high risk patients who desire breast reconstruction. Her past surgical history also includes severe complications after colon surgery leading to wound care issues and hernia formation. These complications reduce other autologous tissue options for Mrs. Price such as a TRAM or DIEP flap.

Dr. Lapuerta clarified that the "procedure performed by Dr. Horndeski in March of 2019" consisted "of what [Dr. Horndeski] refers to as 'bellasoma procedure.'" He also reiterated that the Bellasoma procedure was "complicated by multiple infected pustules and required" surgery and "wound care with oral antibiotic therapy to eventually heal," and he stated that the complications from the Bellasoma procedure required "five to six subsequent operative debridements by three other surgeons," rather than three surgeries he stated in his Supplemental Report. For the first time in his Amended Report, Dr. Lapuerta further stated:

> Based upon my experience, training, practice and review of literature, the accepted standard of care for a plastic surgeon presented with the history and examination of Cheryl Price as set forth within Dr. Horndeski's records is to perform no reconstructive procedure whatsoever. Additionally, the procedure performed by Dr. Horndeski consisted of a "Bellasoma" reconstruction and is explained at www.horndeski.com. The standard of care operations in breast reconstruction would include implant reconstruction, TRAM flaps or DIEP flaps and latissimus muscle flaps. The "Bellasoma" reconstruction varies from the standard of care and ordinary breast reconstructive surgery and, even if a plastic surgeon was to ignore the standard of care to do nothing, the procedure described and performed by Dr. Horndeski breached the standard of care.

In another section of the Amended Report, Dr. Lapuerta stated Price had undergone "a latissimus flap," and the Bellasoma procedure is "an unknown procedure, experimental at best, and not the standard of care in any community," which "Dr. Horndeski actually refers to. . . as the 'ultimate' breast lift."

Unlike his Supplemental Report, when viewed in its entirety and liberally construed in Price's favor, Dr. Lapuerta's Amended Report articulated two standards of care applicable to Dr. Horndeski. According to Dr. Lapuerta, the applicable standard of care for a plastic surgeon presented with a patient who has had multiple unsuccessful breast reconstruction surgeries in the past, including a "failed attempt at implant reconstruction," and "a latissimus flap," and has "a history of severe healing problems" post-surgery which "reduce[d] other autologous tissue options for Mrs. Price such as a TRAM or DIEP flap," is "to perform no reconstructive procedure whatsoever." *See Baty*, 543 S.W.3d at 694 (stating courts should assess sufficiency of expert report by considering entire report, not just discrete portions); *Henry*, 375 S.W.3d at 535 (stating expert reports should be liberally construed in favor of plaintiffs); *see generally Keepers*, 2022 WL 2347744, at *12 ("The stated standard of care need not be complicated for it to be sufficient."). According to Dr. Lapuerta, Dr. Horndeski breached that standard of care by performing the Bellasoma procedure on Price in light of her medical history, a procedure Dr. Lapuerta explains "varies from the standard of care and ordinary breast reconstruction surgery."

19

When viewed in its entirety and liberally construed in Price's favor, Dr. Lapuerta's Amended Report also states the standard of care for a plastic surgeon performing breast reconstruction surgery is to perform a known breast reconstruction procedure, not an unknown or experimental procedure. Dr. Lapuerta opines Dr. Horndeski breached that standard of care by performing the Bellasoma procedure on Price because the Bellasoma procedure is "an unknown procedure" that is "experimental at best" and "varies from an ordinary breast reconstruction surgery." *See Baty*, 543 S.W.3d at 694 (stating courts should consider entire expert report when determining sufficiency); *Henry*, 375 S.W.3d at 535 (stating expert reports should be liberally construed in favor of plaintiffs); *see generally Keepers*, 2022 WL 2347744, at *12 (recognizing uncomplicated standard of care may "be sufficient" for purposes of Section 74.351).

Having done so, Dr. Lapuerta has informed Dr. Horndeski that he should have refrained from performing any breast reconstruction surgery on Price in light of her prior medical history, including failed reconstructive surgeries, and in no event should Dr. Horndeski have performed the Bellasoma procedure on Price because it is an unknown and experimental procedure. *See Abshire*, 563 S.W.3d at 226 (stating expert report must set forth "specific information about what the defendant should have done differently"); *see generally Grindstaff v. Michie*, 242 S.W.3d 536, 543 (Tex. App.—El Paso 2007, no pet.) ("While these statements are written in the

20

negative rather than the positive, the report provides specific information about what Dr. Grindstaff should have done differently.").

According to Dr. Horndeski, Dr. Lapuerta's Amended Report is conclusory regarding the standard of care and breach because the Amended Report does not provide a sufficient factual basis for Dr. Lapuerta's assertion Price had "multiple failed reconstructive attempts." On the contrary, the Amended Report states Price had "bilateral mastectomies followed by delayed breast cancer reconstruction with implants in 1999," "a latissimus flap in the past," and "some other type of breast procedure in 2000 as well." Dr. Lapuerta further states that Price's "past surgical history includes a failed attempt at implant reconstruction, which is one of the standard operations performed in high risk patients who desire breast reconstruction." According to Dr. Lapuerta, Price "had already failed multiple attempts at bilateral breast reconstruction and has a history of severe wound problems after other operations on her body."

Dr. Horndeski also argues the Amended Report does not provide a sufficient factual basis for Dr. Lapuerta's assertion that Price was not a candidate for breast reconstruction surgery or "set forth the preexisting condition such that made Price a high-risk surgical candidate for the procedure in question." In his Amended Report, Dr. Lapuerta opines that the "standard of care operations in breast reconstruction would include implant reconstruction, TRAM flaps or DIEP flaps and latissimus

21

muscle flaps." According to Dr. Lapuerta, when Dr. Horndeski operated on Price, Price had already had a "failed attempt at implant reconstruction" and a latissimus muscle flap, and her "past surgical history also includes severe complications . . . [which] reduce other autologous tissue options for Mrs. Price such as a TRAM or DIEP flap." Dr. Lapuerta thus explained Price was not a good candidate for the Bellasoma procedure, or any other breast reconstruction surgery, because the breast reconstruction surgeries she had in the past were unsuccessful and TRAM flaps or DIEP flaps, the other standard breast reconstruction surgeries, were not available options given Price's history of impaired wound healing and post-surgical complications. Having done so, Dr. Lapuerta's Amended Report provides sufficient factual information supporting his opinions on the applicable standard of care. *See Windrum v. Kareh*, 581 S.W.3d 761, 770 (Tex. 2019) ("The line determining whether an expert opinion is conclusory is difficult to draw, and '[c]lose calls must go to the trial court.'") (quoting *Larson*, 197 S.W.3d at 304); *see also Baty*, 543 S.W.3d at 695 (stating conclusory statements in expert report context fail to "provide the requisite 'specific information about what the defendant should have done differently'") (quoting *Palacios*, 46 S.W.3d at 880)).

The purpose of Section 74.351 is to deter frivolous health care liability claims "by requiring a claimant early in litigation to produce the opinion of a suitable expert that his claim has merit." *Zamarripa*, 526 S.W.3d at 460 (quoting *Scoresby*, 346

22

S.W.3d at 552). Although Section 74.351's expert report requirements are mandatory with regard to all health care liability claims, the requirements to not present an exacting or particularly burdensome standard. *See also Loaisiga*, 379 S.W.3d at 264 (stating expert report requirement creates "a low threshold a person claiming against a health care provider must cross merely to show that his claim is not frivolous"); *see also Curnel v. Hous. Methodist Hosp.-Willowbrook*, 562 S.W.3d 553, 562–63 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (stating Section 74.351's requirements "have been variously described as a 'lenient standard,' 'low threshold,' and 'relatively low bar'") (footnotes omitted)).

Liberally construing Dr. Lapuerta's Amended Report in Price's favor and bearing in mind that Section 74.351's limited purpose is to dispose of frivolous claims, we conclude the trial court reasonably could have determined that Dr. Lapuerta's Amended Report represented a good-faith effort to inform Dr. Horndeski of the applicable standard of care and manner in which Dr. Horndeski allegedly breached that standard, as required by Section 74.351(r)(6). *See Henry*, 375 S.W.3d at 535 (stating Texas Supreme Court "has encouraged trial courts to liberally construe expert reports in favor of plaintiffs"). Although the Amended Report could have provided a more robust discussion of Dr. Lapuerta's opinions on standard of care and breach, we nevertheless consider it sufficient, and to the extent the report's

23

adequacy is a close call, "[c]lose calls must go to the trial court." *Larson*, 197 S.W.3d at 304.

**D.    Causation**

An expert report must provide a "fair summary" of the expert's opinion regarding the causal relationship between the failure of a defendant health care provider to provide care in accord with the applicable standard of care and the plaintiff's claimed injury, harm, or damages. TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6); *E.D. by & through B.O.*, 644 S.W.3d at 663. An expert does not fulfill the statutory requirements by generally opining that the defendant's breach caused an injury. *Jelinek*, 328 S.W.3d at 539 (citing *Palacios*, 46 S.W.3d at 879); *Guillory*, 2020 WL 4516872 at *12; *see also Abshire*, 563 S.W.3d at 224 ("A conclusory statement of causation is inadequate . . . ."). Such a statement is conclusory and provides merely the expert's *ipse dixit*. *See Jelinek*, 328 S.W.3d at 539. Instead, the expert report must explain how and why the defendant health care provider's breach proximately caused the plaintiff's injury. *Zamarripa*, 526 S.W.3d at 460 (stating expert report sufficient as to causation if it makes "a good-faith effort to explain, factually, how proximate cause is going to be proven"). Although "magical words" are not required, mere invocation of the phrases such as "proximate cause," "foreseeability," or "cause in fact" does not ensure the report will be found adequate. *See id.*

The "detail needed to establish a causal link generally is proportional to the complexity of the negligent act giving rise to the claim." *Columbia Med. Ctr. of Arlington Subsidiary L.P. v. L.M.*, No. 02-17-00147-CV, 2018 WL 1095746, at *7 (Tex. App.—Fort Worth Mar. 1, 2018, no pet.) (mem. op.). In other words, a "causation opinion is not conclusory simply because it is not complex." *Id.*

Proximate cause has two components: cause-in-fact and foreseeability. *Zamarripa*, 526 S.W.3d at 460; *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). A defendant physician's breach was a cause-in-fact of the plaintiff's injury if the breach was a substantial factor in bringing about the harm, and absent the breach the harm would not have occurred. *Gunn*, 554 S.W.3d at 658. Even if the harm would not have occurred absent the defendant physician's breach, "the connection between the defendant and the plaintiff's injuries simply may be too attenuated" for the breach to qualify as a substantial factor. *Allways Auto Grp., Ltd. v. Walters*, 530 S.W.3d 147, 149 (Tex. 2017) (internal quotations omitted); *CHCA Clear Lake, L.P. v. Stewart*, No. 01-19-00874-CV, 2021 WL 3412461, at *10 (Tex. App.—Houston [1st Dist.] Aug. 5, 2021, no pet.) (mem. op.). A breach is not a substantial factor if it "does no more than furnish the condition that makes the plaintiff's injury possible." *Allways Auto Grp.*, 530 S.W.3d at 149. A defendant physician's breach is a foreseeable cause of the plaintiff's injury if a physician of ordinary intelligence would have anticipated the danger caused by the negligent act or omission. *Puppala*

25

*v. Perry*, 564 S.W.3d 190, 197 (Tex. App.—Houston [1st Dist.] 2018, no pet.); *CHCA Clear Lake*, 2021 WL 3412461, at *10. Dr. Horndeski argues Dr. Lapuerta's Amended Report does not provide a fair summary of Dr. Lapuerta's opinion regarding the causal relationship between Dr. Horndeski's alleged breaches of the standard of care and Price's harm because Dr. Lapuerta does not explain how and why Dr. Horndeski's alleged breaches caused Price's "complicated healing and subsequent procedures," and further that Dr. Lapuerta's statements regarding the causal relationship are conclusory. According to Dr. Horndeski, Dr. Lapuerta's Amended Report suffers from the same deficiencies as his Original and Supplemental Reports, which we found were inadequate in *Horndeski I*, because Dr. Lapuerta "merely reorganized sentences he had in his previous reports and sprinkled in additional words such as 'foreseeable' and 'inevitable.'"

We find the opinions in *Grindstaff v. Michie*, 242 S.W.3d 536 (Tex. App.—El Paso 2007, no pet.) and *Ranelle v. Beavers*, No. 02-08-437-CV, 2009 WL 1176445 (Tex. App.—Fort Worth Apr. 30, 2009, no pet.) (mem. op.) to be instructive to our analysis. We discuss them in turn.

In *Grindstaff,* Sandra Michie filed a health care liability claim against her former podiatrist, Dr. Grindstaff, alleging Dr. Grindstaff was negligent by among other things, "performing a surgical procedure that was not indicated for her then existing condition and diagnosis." *Id.* at 539. She served Dr. Grindstaff with a report

26

prepared by her expert, Dr. Cartwright. *Id.* Dr. Grindstaff objected to the adequacy of Dr. Cartwright's report and moved to dismiss with prejudice Michie's negligence claim against him. The trial court found Dr. Cartwright's report complied with Section 74.351 and denied Dr. Grindstaff's motion to dismiss. *Id.*

On appeal, Dr. Grindstaff argued Dr. Cartwright's report did not satisfy the requirements of Section 74.351 because it "fail[ed] to address causation or, in the alternative, [was] merely conclusory." *Id.* at 544. With respect to causation, Dr. Cartwright's report stated:

> The surgery is subsequently performed on both feet simultaneously and the patient ultimately achieves no benefit whatsoever and in fact feels that her condition is now worse. She is now unable to wear much of the footwear she states she was able to wear prior to surgery and that she is much less ambulatory than she was prior to surgery. She claims that her pain is much greater. I believe these complaints are a direct result of the surgery that was neither warranted or indicated.

*Id.* According to Dr. Cartwright, "Dr. Grindstaff's recommendation for bilateral surgery is generally not recommended and performing the surgery endoscopically was contraindicated since Michie presented with symptoms suggesting nerve compression." *Id.* The court held the trial court had not abused its discretion by finding Dr. Cartwright's report complied with Section 74.351. *Id.* The opinion states:

> According to Dr. Cartwright, Dr. Grindstaff breached the standard of care by recommending a surgical procedure that was contraindicated, controversial, had a high risk of complications, and should not have been performed bilaterally. Following surgery, Michie's pain and

27

condition worsened. This was a "direct result of the surgery that was neither warranted or indicated." Such is generally the case where the negligence claim arises from surgery gone awry. All of Dr. Cartwright's opinions were "based on a reasonable degree of medical probability."

*Id.*

Similar, in *Ranelle*, Herschel Beavers filed negligence and medical battery claims against his former surgeon, Dr. Ranelle, alleging Dr. Ranelle was negligent by among other things, "[p]erform[ing an] unnecessary surgery." 2009 WL 1176445, at *1. According to Beavers, Dr. Ranelle misrepresented to him that he needed back surgery to treat a non-existent medical condition, and Dr. Ranelle negligently performed the unnecessary surgery. *Id.* Dr. Ranelle objected to the adequacy of the report prepared by Beavers' expert, Dr. McBride, and moved to dismiss with prejudice Beavers' claims against him. In his report, Dr. McBride stated:

> [Beavers'] ongoing back problems and all of the consequences that naturally flow from performing a surgery that would not have been performed if Dr. Ranelle had been honest. These consequences include hospitalization, pain associated with recovery from the trauma of surgery, limitation in activities and additional medical care including in this case, physical therapy and additional surgery to remove the bone stimulator.

*Id.* at *4 (discussing medical battery claim).

> It is my opinion based on reasonable medical probability that the failure of Dr. Ranelle to observe the standards of care in Herschel Beavers' case was a proximate cause of the [sic] Mr. Beavers' ongoing back problems and all of the consequences that naturally flow from

28

> performing a surgery that would *not have been performed* if Dr. Ranelle had been honest.

*Id.* at *6 (discussing negligent claim based on unnecessary surgery) (emphasis in original). The court held the trial court did not abuse its discretion by finding Dr. McBride's opinion was adequate with regard to the casual relationship between Dr. Ranelle's performance of the unnecessary surgery and Beavers' harm. *Id.*

In his Amended Report, Dr. Lapuerta states Price's medical history includes multiple failed breast reconstruction procedures and a history of severe post-surgical complications and impaired wound healing. Dr. Lapuerta opines Dr. Horndeski breached the standard of care by performing the Bellasoma procedure on Price, an experimental elective breast reconstruction surgery that was contraindicated by Price's medical history and not standard for reconstructive surgery. According to Dr. Lapuerta, Price "developed severe complications of abscess formation, bilateral open breast wounds" after the Bellasoma surgery, which required five or six surgeries over seventh months and oral antibiotics to treat. When viewed in its entirety and liberally construed in Price's favor, Dr. Lapuerta's Amended Report reflects Dr. Lapuerta's opinion that had Dr. Horndeski refrained from performing any breast reconstruction surgery, including the Bellasoma procedure, Price would not have suffered severe post-surgical complications, as she had after prior surgeries, that required multiple surgeries to treat. In other words, Price, who had a history of severe post-surgical complications and impaired wound healing, suffered severe

29

post-surgical complications and impaired wound healing after the Bellasoma surgical procedure performed by Dr. Horndeski, and Price would not have suffered such post-surgical injuries if Dr. Horndeski had not performed the surgery given his knowledge of Price's medical history.

As in *Grindstaff* and *Ranelle*, Dr. Lapuerta has thus established a relatively simple causal relationship between an unnecessary surgery and the patient's harm which consists of "the consequences that naturally flow from performing a surgery that [should] not have been performed." *Ranelle*, 2009 WL 1176445 at \*4; *Columbia Med. Ctr.*, 2018 WL 1095746, at \*7 (stating expert's "causation opinion is not conclusory simply because it is not complex"); *Curnel v. Hous. Methodist Willowbrook Hosp.*, No. 01-18-01054-CV, 2019 WL 7341669, at \*8 (Tex. App.—Houston [1st Dist.] Dec. 31, 2019, no pet.) (mem. op.) ("Expert reports must provide a causal relationship between the breach and the injury, but case law rejects requiring every single detail to satisfy the requirements of Section 74.351."); *cf. Power v. Kelley*, 70 S.W.3d 137, 143 (Tex. App.—San Antonio 2001, no pet.) ("Causation may be proven by evidence showing that a surgical procedure was performed that was contraindicated . . . .").

Citing to *Standefer v. Brewer*, 256 S.W.3d 889 (Tex. App.—Dallas 2008), Dr. Horndeski argues that Dr. Lapuerta's report is inadequate as to causation because the report does not "connect beyond *ipse dixit* that had Dr. Horndeski simply

refrained from performing the procedure, [Price] would not have sustained the disfigurement she complains of and all of the subsequent procedures would have been avoided." Dr. Horndeski's reliance on *Standefer* is misplaced.

In *Standefer*, Rose Brewer asserted Dr. Standefer was negligent by failing to obtain her informed consent before performing a cosmetic face-lift procedure. 256 S.W.3d at 890. Dr. Standefer argued that Brewer's expert report was inadequate as to causation because it did not contain a good faith effort to provide a fair summary of the expert's opinion on causation. *Id.* at 893. For a negligence claim based on informed consent, proximate cause "requires proof that had the risk been disclosed, a reasonable person in the same or similar circumstances would have refused the treatment or procedure, and the injury complained of was caused in fact by the undisclosed risk." *Id.* at 892 (citing *McKinley v. Stripling*, 763 S.W.2d 407, 410 (Tex. 1989)). The court held that Brewer's expert report did not "discuss whether a reasonable person would have declined the procedure had they been fully informed of the risks required to be disclosed," and it thus failed to show how Dr. Standefer's failure to disclose "the risk of failure or possible need for further reconstructive surgery caused Brewer's injury or damage." *Id.* at 893. The court held the expert's statements that Brewer "was not a surgical candidate for the procedure or that she was harmed by being advised to undergo 'a simple' but failed face-lift are not sufficient to show causation in a lack of informed consent case." *See id.* Unlike the

31

expert in *Standefer*, Dr. Lapuerta did not have to "discuss whether a reasonable person would have declined the procedure had they been fully informed of the risks required to be disclosed" in order to satisfy the proximate causation element for a theory of negligence based on the performance of an unnecessary and contraindicated surgery. *See Power*, 70 S.W.3d at 143 ("Because Earl's claims are for negligence based on the performance of unnecessary surgeries, Earl is not required to meet the causation requirements for an informed consent claim."). Furthermore, the only theory of negligence in *Standefer* was based on the failure to obtain consent. There is thus no indication in *Standefer* that Brewer's report would have been insufficient if rendered in support of a negligence claim based on something other than the failure to obtain informed consent.

Price need not marshal all of her evidence or prove her case against Dr. Horndeski at this stage of the case. Section 74.351 only requires the plaintiff to serve a report that constitutes a good-faith effort to provide a fair summary of the expert's opinions regarding causation. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(*l*). This good-faith effort is satisfied if the plaintiff's report provides enough information to (1) inform the defendant of the specific conduct the plaintiff calls into question and (2) provide a basis for the trial court to conclude that the claims have merit. *Palacios*, 46 S.W.3d at 879; *see generally Henry*, 375 S.W.3d at 535 (stating Texas Supreme Court "has encouraged trial courts to liberally construe expert reports in

favor of plaintiffs"). When viewed in its entirety and liberally construed in favor of Price, Dr. Lapuerta's Amended Report constitutes a good faith effort to provide Dr. Horndeski with Dr. Lapuerta's opinions regarding the causal relationship between Dr. Horndeski's breaches of the standard of care and Price's harm. *See Ortiz*, 378 S.W.3d at 671 ("We determine whether a causation opinion is sufficient by considering it in the context of the entire report."); *Austin Heart, P.A.*, 228 S.W.3d at 282 ("The form of the report and the location of the information in the report are not dispositive.").

Like our holding with respect to the adequacy of Dr. Lapuerta's Amended Report on standard of care and breach, in reaching our decision with respect to the sufficiency of the Amended Report on the element of causation, we are mindful that the expert report requirement is a low initial threshold intended to deter frivolous claims, not to dispose of claims regardless of their merit. *See Zamarripa*, 526 S.W.3d at 460 (stating Section 74.351 intended to deter frivolous health care liability claims "by requiring a claimant early in litigation to produce the opinion of a suitable expert that his claim has merit") (quoting *Scoresby*, 346 S.W.3d at 552); *see also Loaisiga*, 379 S.W.3d at 264 (stating expert report requirement creates "a low threshold a person claiming against a health care provider must cross merely to show that his claim is not frivolous"). Although the Amended Report could have provided a more robust discussion of Dr. Lapuerta's opinion on the causal relationship

between Dr. Horndeski's breach and Price's harm, we nevertheless consider it sufficient, and to the extent the report's adequacy is a close call with respect to causation, "[c]lose calls must go to the trial court." *Larson*, 197 S.W.3d at 304.

## Conclusion

We affirm the trial court's order denying Dr. Horndeski's motion to dismiss with prejudice Price's negligence claim.


Veronica Rivas-Molloy
Justice


Panel consists of Chief Justice Adams and Justices Landau and Rivas-Molloy.