**Opinion issued April 28, 2026**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-25-00011-CV

————————————

**JAMES SHAFFER, CRNA AND EPIX MEDICAL SERVICES OF HOUSTON, PLLC, Appellants**

**V.**

**MARQUITA JONES, AS POWER OF ATTORNEY FOR SHRONDA JONES, Appellee**

---

**On Appeal from the 55th District Court
Harris County, Texas
Trial Court Case No. 2024-34116**

---

## MEMORANDUM OPINION

In this interlocutory appeal,[1] appellants, James Shaffer, CRNA and Epix Medical Services of Houston, PLLC ("Epix Medical Services") (collectively,

---

[1]     *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(9).

"appellants"), challenge the trial court's order denying their motion to dismiss the health care liability claims[2] brought against them by appellee, Marquita Jones ("Marquita"), as Power of Attorney for Shronda Jones ("Shronda"), in her suit for negligence. In their sole issue, appellants contend that the trial court erred in denying their motion to dismiss Marquita's claims against them.[3]

We affirm.

## Background

In her petition, Marquita alleges that on June 2, 2022, Shronda went to Memorial Hermann Texas International Endoscopy Center, doing business as Texas International Endoscopy Center ("Texas International Endoscopy Center"), for a colonoscopy procedure that was performed by Andrea Duchini, M.D. Shaffer, a certified registered nurse anesthetist, administered Shronda anesthesia for the colonoscopy procedure and was supervised by Les Yarmush, M.D. After the induction of anesthesia and approximately four minutes after the start of the procedure, at about 9:30 a.m., Shronda developed bradycardia and hypotension. According to Marquita, Shaffer did not tell Dr. Yarmush of Shronda's "change in

---

[2]     See id. § 74.001(a)(13) (defining "[h]ealth care liability claim" (internal quotations omitted)).

[3]     See id. § 74.351 (governing expert reports).

2

status" for fifteen minutes, and during that time, Dr. Duchini continued with the colonoscopy procedure.

At 9:45 a.m., Dr. Yarmush arrived "to administer advanced cardiac life support" to Shronda. At 10:00 a.m., emergency medical services arrived and transported Shronda "to a subsequent facility where she was placed" in the intensive care unit ("ICU"). Shronda was diagnosed with "an anoxic brain injury as a result of prolonged oxygen loss."[4]

Marquita brings a health care liability claim against Shaffer, alleging that he was negligent in failing to adequately and timely treat Shronda's bradycardia and hypotension and was negligent in failing to timely report the complications during the colonoscopy procedure to his supervisor, Dr. Yarmush. In doing so, Shaffer breached the standard of care which was the proximate cause of the injuries sustained by Shronda. Marquita also brings a health care liability claim against Dr. Yarmush, asserting that he was negligent in failing to properly supervise Shaffer during the colonoscopy procedure, in failing to promptly diagnose and treat Shronda's bradycardia and hypotension, and in performing advanced cardiac life support. In

---

[4]     "[A]n anoxic brain injury . . . occurs when the brain does not receive enough blood flow or oxygen to maintain its activity and keep itself alive." *Keepers v. Smith*, No. 01-20-00463-CV, 2022 WL 2347744, at *1 n.4 (Tex. App.—Houston [1st Dist.] June 30, 2022, pet. denied) (mem. op.) (alterations in original) (internal quotations omitted).

3

doing so, Dr. Yarmush breached the standard of care which was the proximate cause of the injuries sustained by Shronda.[5]

Additionally, Marquita brings vicarious liability health care liability claims against Epix Medical Services, alleging that it is vicariously liable for the negligence of Shaffer and Dr. Yarmush, who were acting in the course and scope of their employment at all relevant times.[6] Marquita requested damages.

To support her health care liability claims, Marquita served appellants with an expert report authored by Jon Reynolds, M.D.[7] In his expert report, Dr. Reynolds states that he is a board certified anesthesiologist and licensed to practice medicine in North Carolina. He is an associate professor of anesthesiology at Atrium Wake Forest Baptist Health and the medical director for procedural sedation at Wake Forest Baptist Medical Center. According to Dr. Reynolds, he has "substantial experience personally providing and medically directing anesthesia for colonoscopies."

Further, Dr. Reynolds states that he is familiar with the applicable standard of care for anesthesia related to Shronda's case based on his medical education and his

---

[5]   Dr. Yarmush is not a party to this appeal.

[6]   In her suit, Marquita also brought health care liability claims against Dr. Duchini and another entity, Gastroenterology and Transplant Hepatology International, P.A., but they are not parties to this appeal. Marquita nonsuited her claims against Memorial Hermann Endoscopy Center, who is also not a party to this appeal.

[7]   Dr. Reynolds attached his curriculum vitae ("CV") to his expert report.

4

residency training in anesthesiology. Dr. Reynolds has consistently practiced in an endoscopy and colonoscopy setting, continued his medical education, and has maintained his board certification which allows him to have "a clear knowledge and familiarity of the [s]tandard[] of [c]are" relevant to the instant case. He is "familiar with the nation-wide provision of anesthesia for colonoscopies, now routinely provided by anesthesia staff using the more rapid and efficient drug propofol rather than sedatives administered by a gastrointestinal physician and a [r]egistered [n]urse." His "education, background, and experience, and working with nursing staff and other physicians, including gastroenterologists, in an endoscopy setting," has given him "knowledge of the accepted standard[] of care for physicians and nursing staff participating in [an] endoscopy and colonoscopy setting."

As to Shronda, Dr. Reynolds's expert report states that on June 2, 2022, Shronda went to the Texas International Endoscopy Center for a screening colonoscopy procedure. Dr. Duchini performed the procedure. Shaffer gave Shronda anesthesia for the procedure and was "medically directed" by Dr. Yarmush during the delivery of the anesthetic. After the induction of anesthesia and four minutes after the start of the colonoscopy procedure, at about 9:30 a.m., Shronda developed bradycardia. However, Shronda was not provided with "a higher concentration of oxygen via a bag-valve-mask . . . apparatus" until 9:46 a.m., sixteen minutes after she developed bradycardia. Shronda became hypotensive at

5

approximately 9:31 a.m. Sixteen minutes elapsed where Shronda's breathing was not charted as either spontaneous or assisted in the anesthesia record. There is no evidence that Shaffer communicated with Dr. Yarmush that Shronda's vital signs were unstable until 9:45 a.m. There is no evidence that the colonoscopy procedure was paused or terminated to see if that would resolve Shronda's bradycardia or hypotension. Dr. Duchini continued performing the colonoscopy procedure until 9:45 a.m.

Dr. Reynolds's report further states that at 9:45 a.m., fifteen minutes after Shronda's vital signs had dropped, Dr. Yarmush was "called emergently to and arrived in the procedure room" where he ordered advanced cardiac life support, consisting of atropine, ephedrine, oxygen by bag-valve-mask, epinephrine, cardiopulmonary resuscitation ("CPR"), and ultimately intubation of the trachea. Shronda was intubated nine minutes after Dr. Yarmush arrived. Subsequently, Shronda was transported by emergency medical services to the hospital and admitted to the ICU. At the hospital, she remained intubated and was diagnosed with an anoxic brain injury resulting in severe injury and disability.

As to Shaffer, Dr. Reynolds's expert report states that the standard of care for Shaffer, a certified registered nurse anesthetist, during the colonoscopy procedure, was to monitor Shronda's blood pressure while she was under anesthesia and to adequately and timely treat a change in her blood pressure. According to Dr.

6

Reynolds, Shaffer breached the standard of care by not adequately and timely treating Shronda's steadily falling blood pressure. For instance, Shaffer failed to treat Shronda's hypotension, which began at approximately 9:31 a.m., for about ten minutes until ephedrine was given. Shaffer also breached the standard of care by delaying the administration of a vasopressor.[8] Additionally, Shaffer breached the standard of care by failing to suggest pausing or aborting the colonoscopy procedure and by failing to relay timely critical information to Dr. Yarmush so that Dr. Yarmush could diagnose and treat the hemodynamic collapse of Shronda.

Further, Dr. Reynolds's report states, as to Shaffer and Dr. Yarmush, that once Shronda had developed prolonged bradycardia the standard of care required them to provide airway support and oxygen at a higher concentration "via a Hudson type face mask . . . or a positive pressure device." According to Dr. Reynolds, the standard of care required that Shaffer and Dr. Yarmush have a "bag-valve-mask . . . positive-pressure oxygen delivery system" available during all "anesthetics and code situations" because it "c[ould] deliver a 95%+ concentration of oxygen as well as assist [a] patient in breathing via mask ventilation techniques." However, Shaffer and Dr. Yarmush breached the standard of care by not using "[a] face mask" or a "bag-valve-mask" until CPR was started ten minutes after the last

---

[8]     Vasopressors are medications to treat low blood pressure. *See, e.g.*, *Das v. Hester*, No. 14-19-00596-CV, 2020 WL 3422389, at *1 (Tex. App.—Houston [14th Dist.] June 23, 2020, no pet.) (mem. op.).

7

recorded vitals signs for Shronda. And Shaffer and Dr. Yarmush breached the standard of care by "fail[ing] to escalate both the oxygen concentration and airway management prior to and during [the] resuscitation" of Shronda.

Dr. Reynolds's expert report further explains, as to the standard of care related to Shaffer and Dr. Yarmush, that the Advanced Cardia Life Support "recommend[s] [an] atropine dose for the treatment of bradycardia" at 1.0 milligrams. But Shaffer and Dr. Yarmush breached the standard of care by initially giving Shronda a dose of 0.4 milligrams, which could have resulted in paradoxical bradycardia and lowered her already slowed heart rate. Subsequently, there were "five doses of atropine recorded on two different documents making the total dosing unclear as to the total amount given" to Shronda. The dosing sequence provided by Shaffer and Dr. Yarmush to Shronda to treat her bradycardia breached the standard of care.

As to causation, Dr. Reynolds's expert report states that the brain requires adequate oxygen delivery for survival and is the most sensitive organ to the lack of oxygen. When brain tissue is deprived of oxygen for even a few minutes, the brain cells begin to die, which is known as anoxia. Shaffer's and Dr. Yarmush's breaches of the standard of care caused Shronda's anoxic brain injury. Specifically, Dr. Reynolds explains in his report:

> The failure to provide vasopressors when bradycardia and hypotension w[ere] first encountered caused a delay in addressing [Shronda's] drop in heart rate and blood pressure. Once the decision was made to treat the drop in [Shronda's] heart rate, the dose of atropine provided to

8

[Shronda] at a critical time was below the recommended dose, which resulted in incomplete treatment of her bradycardia. The failure to abort the [colonoscopy] procedure also removed a potential treatment for the drop in [Shronda's] heart rate and blood pressure. Additionally, the record supports a period of sub-standard monitoring, airway management[,] and decision-making by . . . [Shaffer and Dr. Yarmush] with gaps in vital signs signaling inadequate oxygen delivery and ventilation over enough time to create a physiologic state of anoxia in [Shronda's] brain tissue. Absent these deviations in the standard of care, more likely than not, [Shronda] would not have suffered an anoxic brain injury.

Appellants objected to Dr. Reynolds's expert report and moved to dismiss Marquita's health care liability claims against them. Appellants argued that Dr. Reynolds's expert report was inadequate as to the standard of care, breach of the standard of care, and causation related to Shaffer because it is conclusory, speculative, and "simply offer[ed] opinions by Dr. Reynolds that amount[ed] to nothing more than his conclusions." For instance, as to the standard of care related to Shaffer, the expert report states that the standard of care required Shaffer to "adequately and timely treat a change in [Shronda's] blood pressure[,] but [does not] explain[] what that adequate treatment would have been nor . . . what is meant by timely treatment." (Internal quotations omitted.) Further, Dr. Reynolds's report "criticizes [Shaffer] for not [providing] a higher concentration of supplemental oxygen after [Shronda] developed prolonged bradycardia[,] [but it] never explains what the timeframe for prolonged bradycardia means." (Internal quotations omitted.) Additionally, as to breach of the standard of care, Dr. Reynolds's expert

report states that Shaffer breached the standard of care by failing to relay "critical information" to Dr. Yarmush, but the report does not explain what critical information was required to be relayed. (Internal quotations omitted.)

Additionally, as to causation, appellants asserted that Dr. Reynolds, in his expert report, failed to explain how and why the alleged breaches of the standard of care caused Shronda to suffer an anoxic brain injury. According to appellants,

> Dr. Reynolds attempt[ed] to address causation by stating that administration of atropine at a dose lower than he opines was needed "c[ould] cause" paradoxical bradycardia but he never then explain[ed] whether it did cause paradoxical bradycardia in [Shronda]. Dr. Reynolds also repeatedly refer[red] to things not being done "timely" so that he c[ould] offer the causation opinion that a delay caused the injury. Without describing what was required nor when it was required, the conclusion that "delay" caused injury is nothing more than the ipse dixit of Dr. Reynolds.

(Emphasis omitted.)

Marquita responded to appellants' objections and motion to dismiss, asserting that Dr. Reynolds's expert report adequately set forth the applicable standard of care and breach of the standard of care and provided a fair summary as to Dr. Reynolds's opinion as to causation. According to Marquita, appellants' objections "focus[ed] on demanding excessive and unreasonable specificity in Dr. Reynolds'[s] report in defining certain terms, such as 'adequately and timely treat[ing] a change in the blood pressure,' 'prolonged bradycardia,' and 'critical information.'" (Second alteration in original.) This was not required by Texas law, which only requires an

10

expert report to provide a fair summary of the standard of care and how the care rendered failed to meet the applicable standard of care.

Further, Texas law also provides that an expert report must adequately address only one pleaded theory of liability to be sufficient,[9] and appellants did not object to any deficiencies in Dr. Reynolds's expert report regarding Shaffer's failure to pause or abort the colonoscopy procedure and provide an appropriate sequence of atropine to stabilize Shronda's bradycardia. Because appellants failed to object to those portions of the expert report, Marquita argued that the report should be deemed adequate.

Additionally, as to causation, Marquita explained in her response that Dr. Reynolds's expert report appropriately explained the basis for his opinions and linked his conclusions to specific facts. Dr. Reynolds's report states that Shaffer's and Dr. Yarmush's failures to (1) provide vasopressors when bradycardia and hypotension were first encountered, (2) provide appropriate airway management, (3) abort the colonoscopy procedure, (4) exhibit appropriate decision-making, and (5) deliver an appropriate dose of atropine, directly created a physiologic state of anoxia in Shronda's brain tissue. Dr. Reynolds's report provided a good faith effort to outline how the breaches of the standard of care led to Shronda's injuries, which was all that was required.

---

[9]    *See Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 632 (Tex. 2013).

11

After a hearing on appellants' objections and motion to dismiss, the trial court overruled appellants' objections to Dr. Reynolds's expert report and denied appellants' motion to dismiss.

## Standard of Review

We review a trial court's decision on a motion to dismiss a health care liability claim for an abuse of discretion. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001); *Gray v. CHCA Bayshore L.P.*, 189 S.W.3d 855, 858 (Tex. App.—Houston [1st Dist.] 2006, no pet.). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010). When reviewing matters committed to a trial court's discretion, we may not substitute our own judgment for that of the trial court. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). A trial court does not abuse its discretion merely because it decides a discretionary matter differently than an appellate court would in a similar circumstance. *Harris Cnty. Hosp. Dist. v. Garrett*, 232 S.W.3d 170, 176 (Tex. App.—Houston [1st Dist.] 2007, no pet.). But a trial court has no discretion in determining what the law is or in applying the law to the facts. *See Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992). In conducting our review, we always consider that the Legislature's goal in requiring expert reports is to deter baseless claims, not block earnest ones. *Jackson v. Kindred Hosps. Ltd. P'ship*, 565 S.W.3d

12

75, 81 (Tex. App.—Fort Worth 2018, pet. denied); *Gonzalez v. Padilla*, 485 S.W.3d 236, 242 (Tex. App.—El Paso 2016, no pet.); *see also Scoresby v. Santillan*, 346 S.W.3d 546, 554 (Tex. 2011).

Under the Texas Medical Liability Act ("TMLA"), a plaintiff asserting a health care liability claim must timely serve each defendant health care provider[10] with at least one expert report, with a CV for the expert whose opinion is offered, to substantiate the merits of the plaintiff's claim. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a), (i); *see also Mangin v. Wendt*, 480 S.W.3d 701, 705 (Tex. App.—Houston [1st Dist.] 2015, no pet.). The purpose of the expert report requirement is to weed out unmeritorious claims, not to dispose of potentially meritorious claims. *See E.D. by & through B.O. v. Tex. Health Care, P.L.L.C.*, 644 S.W.3d 660, 664 (Tex. 2022); *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018).

An expert report must provide a "fair summary" of the expert's opinions on (1) the applicable standard of care, (2) the manner in which the care rendered by the defendant health care provider failed to meet the standard of care, and (3) the causal relationship between that failure and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6); *see also Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013). A "fair summary" of the expert's opinions means

---

[10]   *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(12)(A) (defining "[h]ealth care provider" (internal quotations omitted)).

that, at the least, the report must state more than the expert's mere conclusions on the standard of care, breach, and causation; it must instead explain the basis of the expert's opinion so as to link the conclusions to the facts of the case. *See Jelinek*, 328 S.W.3d at 539; *Wright*, 79 S.W.3d at 52.

If the plaintiff fails to timely serve an expert report, then, on the motion of a defendant health care provider, the trial court must dismiss the pertinent health care liability claim with prejudice and award attorney's fees. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b); *Baty v. Futrell*, 543 S.W.3d 689, 692 (Tex. 2018). But if the plaintiff timely serves an expert report and a defendant health care provider files a motion challenging the adequacy of that report, then the trial court may only grant the motion "if it appears to the court, after [a] hearing, that the report does not represent an objective good faith effort to comply with the [TMLA's] definition of an expert report." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l); *Baty*, 543 S.W.3d at 692–93 (internal quotations omitted); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6) ("[e]xpert report" means "a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding [the] applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed" (internal quotations omitted)).

14

An expert report qualifies as an "objective good faith effort" to avoid dismissal if it discusses each element with sufficient specificity so that it (1) informs the defendant health care provider of the specific conduct that the plaintiff questions or about which the plaintiff complains and (2) provides a basis for the trial court to conclude that the plaintiff's health care liability claim has merit. *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 513 (Tex. 2017); *see also Baty*, 543 S.W.3d at 693–94. The expert report need not use any particular words, and it may be informal, "but bare conclusions will not suffice." *Scoresby*, 346 S.W.3d at 555–56. An expert report meets the minimum requirements for an expert report under the TMLA "if it contains the opinion of an individual with expertise that the claim has merit, and if the defendant[] [health care provider's] conduct is implicated." *Id.* at 557.

In determining whether an expert report constitutes an "objective good faith effort" to address each element, "a trial court may not draw inferences; instead, it must exclusively rely upon the information contained within the four corners of the report." *Puppala v. Perry*, 564 S.W.3d 190, 197 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (internal quotations omitted). Courts must view the report in its entirety, rather than isolating specific portions or sections, to determine whether it is sufficient. *See Baty*, 543 S.W.3d at 694; *see, e.g., Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 144 (Tex. 2015); *see also Austin Heart, P.A. v. Webb*,

15

228 S.W.3d 276, 282 (Tex. App.—Austin 2007, no pet.) ("The form of the report and the location of the information in the report are not dispositive."). In reviewing the adequacy of an expert report, a trial court may not consider an expert's credibility, the data relied on by the expert, or the documents that the expert failed to consider at the pre-discovery stage of the litigation. *See Mettauer v. Noble*, 326 S.W.3d 685, 691–92 (Tex. App.—Houston [1st Dist.] 2010, no pet.); *see also Gonzalez*, 485 S.W.3d at 245.

### Shaffer

In a portion of their sole issue, appellants argue that the trial court erred in overruling their objections to Dr. Reynolds's expert report and denying their motion to dismiss Marquita's health care liability claim against Shaffer because Dr. Reynolds's expert report failed to adequately describe the standard of care as to Shaffer, how Shaffer breached that standard of care, and how Shaffer's alleged breach of the standard of care proximately caused Shronda's injuries.

### A.    Standard of Care and Breach

In a portion of their sole issue, appellants argue that Dr. Reynolds's expert report does not adequately address the standard of care and breach of the standard of care as to Shaffer because it was conclusory and speculative. Further, appellants assert that the expert report failed to identify the standard of care and failed to explain

how the standard of care was breached by Shaffer. There were "analytical gaps in [the] report."

As stated above, an expert report must provide a "fair summary" of the expert's opinions regarding the applicable standard of care and the manner in which the care rendered by the defendant health care provider failed to meet that standard. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6); *Whitmire v. Feathers*, No. 01-19-00094-CV, 2020 WL 4983321, at *13 (Tex. App.—Houston [1st Dist.] Aug. 25, 2020, no pet.) (mem. op.); *see also Potts*, 392 S.W.3d at 630. Identifying the standard of care in a health care liability claim is critical. *Palacios*, 46 S.W.3d at 880. To adequately identify the standard of care, an expert report must set forth "specific information about what the defendant should have done differently." *Abshire*, 563 S.W.3d at 226 (internal quotations omitted). Thus, related to standard of care and breach, the expert report must explain what the defendant health care provider should have done under the circumstances and what the health care provider did instead. *Palacios*, 46 S.W.3d at 880; *Whitmire*, 2020 WL 4983321, at *13; *see also Kline v. Leonard*, No. 01-19-00323-CV, 2019 WL 6904720, at *7 (Tex. App.— Houston [1st Dist.] Dec. 19, 2019, pet. denied) (mem. op.) ("[A]n expert report must provide a fair summary of the expert's opinion regarding the applicable standard of care and the manner in which the care rendered by the health care provider failed to meet the standard." (internal quotations omitted)). It is not sufficient for the expert

to simply state that he knows the standard of care and conclude that it was or was not met. *Palacios*, 46 S.W.3d at 880; *Whitmire*, 2020 WL 4983321, at *13.

As to the applicable standard of care related to Shaffer, Dr. Reynolds's expert report states that the standard of care required Shaffer, a certified registered nurse anesthetist, during the colonoscopy procedure, to monitor the blood pressure of Shronda, the patient under anesthesia, and adequately and timely treat a change in her blood pressure. Once Shronda developed prolonged bradycardia during the procedure, the standard of care required Shaffer to provide Shondra with airway support and oxygen at a higher concentration "via a Hudson type face mask . . . or a positive pressure device." Additionally, the standard of care required that a "bag-valve mask . . . positive-pressure oxygen delivery system" be available for Shaffer to access during all "anesthetics and code situations" because it "c[ould] deliver a 95%+ concentration of oxygen as well as assist [a] patient in breathing via mask ventilation techniques." Dr. Reynolds's expert report also explains that the standard of care required Shaffer to give an "atropine dose" at 1.0 milligrams to treat Shronda's bradycardia.

As to breach of the standard of care, Dr. Reynolds's expert report states that Shaffer breached the standard of care by not adequately and timely treating the change in Shronda's blood pressure during the colonoscopy procedure. Shaffer did not treat Shronda's hypotension for approximately ten minutes and delayed the

18

administration of a vasopressor.  Shaffer also breached the standard of care by failing to suggest pausing or stopping the colonoscopy procedure and by failing to timely relay critical information to Dr. Yarmush so that Dr. Yarmush could diagnosed and treat Shronda's hemodynamic collapse.

Additionally, the expert report states that Shaffer breached the standard of care by not using "[a] face mask" or a "bag-valve mask" on Shronda until CPR was started ten minutes after Shronda's last recorded vital signs.  And Shaffer "fail[ed] to escalate both the oxygen concentration and airway management prior to and during [the] resuscitation" of Shronda.  Shaffer further breached the standard of care by not giving Shronda the recommended 1.0 milligram atropine dose but instead giving her a dose of 0.4 milligrams which could have resulted in paradoxical bradycardia and lowered her already slowed heart rate.  Five doses of atropine were given to Shronda, but the dosing sequencing by Shaffer, based on the records, breached the standard of care.

Appellants assert that Dr. Reynolds's expert report did not explain "what the adequate treatment would have been" for Shronda's change in blood pressure or the timing of that treatment.  Appellants also criticize Dr. Reynolds's expert report for not stating "what [was] meant by 'prolonged bradycardia,' when the higher concentration of oxygen should have been administered," or "what amount of oxygen me[t] the standard of being a 'higher concentration.'"  In appellants' opinion,

the statements made by Dr. Reynolds in his expert report as to standard of care and breach of the standard of care, as it relates to Shaffer, were conclusory and speculative. We disagree.

Dr. Reynolds's expert report identifies the specific actions that should have been taken by Shaffer related to the treatment and care of Shronda during the colonoscopy procedure that were not. *See Abshire*, 563 S.W.3d at 226–27; *see also Baty*, 543 S.W.3d at 695 (report not conclusory where it did not require one to infer what defendant physician should have done differently); *Keepers v. Smith*, No. 01-20-00463-CV, 2022 WL 2347744, at *12 (Tex. App.—Houston [1st Dist.] June 30, 2022, pet. denied) (mem. op.); *Keepers v. Blessett*, No. 01-18-01020-CV, 2019 WL 1523368, at *5 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, no pet.) (mem. op.) (expert report is adequate where it informs defendant of expert's opinion on what defendant should have done and what the defendant did instead). The stated standard of care need not be complicated for it to be sufficient. *See, e.g.*, *Baty*, 543 S.W.3d at 697; *see also Blessett*, 2019 WL 1523368, at *5–6 ("At times, the standard of care can be fairly basic." (internal quotations omitted)). Any additional level of detail requested by appellants is not required at this stage in the litigation. *See, e.g.*, *Smith*, 2022 WL 2347744, at *12; *Whitmire*, 2020 WL 4983321, at *14. Dr. Reynolds, in his report, clearly identifies the standard of care related to Shaffer and Shaffer's breaches of the standard of care. The expert report provides "enough

information" for the trial court to have concluded that it constitutes a good-faith effort to set forth the standard of care and breach related to Shaffer. *See Miller*, 536 S.W.3d at 515–17; *see also New Med. Horizons, II, Ltd. v. Milner*, 575 S.W.3d 53, 60, 64 (Tex. App.—Houston [1st Dist.] 2019, no pet.); *Mettauer*, 326 S.W.3d at 691 (not court's role to determine truth or falsity of expert's opinion, or truth or falsity of facts on which expert bases such opinion, but only to act as gatekeeper in evaluating sufficiency of report itself).

Accordingly, we conclude that the trial court could have reasonably determined that Dr. Reynolds's expert report represented an "objective good faith effort" to inform Shaffer of the specific conduct called into question, the standard of care that should have followed, and what Shaffer should have done differently. *See, e.g.*, *Smith*, 2022 WL 2347744, at *13. Thus, we hold that the trial court did not err in overruling appellants' objections and denying appellants' motion to dismiss on the ground that Dr. Reynolds's expert report did not adequately address the standard of care and breach of the standard of care as to Shaffer.

We overrule this portion of appellants' sole issue.

## B.     Causation

In another portion of their sole issue, appellants argue that Dr. Reynolds's expert report does not adequately address causation as to Shaffer because the report

does not "provide an explanation as to how each of the breaches [of] the standard of care caused [Shronda's] injury."

An expert report must provide a "fair summary" of the expert's opinion regarding the causal relationship between the failure of a defendant health care provider to provide care in accord with the applicable standard of care and the claimed injury, harm, or damages. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6); *see also Potts*, 392 S.W.3d at 630. For causation, the expert report must explain how and why the defendant health care provider's breach proximately caused the injury. *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 459–60 (Tex. 2017). An expert report need not marshal all the plaintiff's proof necessary to establish causation at trial, and it need not anticipate or rebut all possible defensive theories that may ultimately be presented to the trial court. *Wright*, 79 S.W.3d at 52; *Cornejo v. Hilgers*, 446 S.W.3d 113, 123 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). But an expert cannot simply opine that the breach caused the injury. *Jelinek*, 328 S.W.3d at 539.

Causation consists of two components: (1) cause-in-fact and (2) foreseeability. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). A defendant health care provider's breach was a cause-in-fact of the injury if the breach was a substantial factor in bringing about the harm, and absent the breach the harm would not have occurred. *Id.* Even if the harm would not have occurred absent the

22

defendant health care provider's breach, "the connection between the defendant and the . . . injuries simply may be too attenuated" for the breach to qualify as a substantial factor. *Allways Auto Grp., Ltd. v. Walters*, 530 S.W.3d 147, 149 (Tex. 2017) (internal quotations omitted). A breach is not a substantial factor if it "does no more than furnish the condition that makes the . . . injury possible." *Id.* A defendant health care provider's breach is a foreseeable cause of the injury if a health care provider of ordinary intelligence would have anticipated the danger caused by the negligent act or omission. *Puppala*, 564 S.W.3d at 197.

As to causation, Dr. Reynolds's expert report states that the brain requires adequate oxygen delivery for survival and is the most sensitive organ to the lack of oxygen. When brain tissue is deprived of oxygen for even a few minutes, the brain cells begin to die, which is known as anoxia. Shaffer's breaches of the standard of care caused Shronda's anoxic brain injury. Specifically, Dr. Reynolds explains in his report that:

> [Shaffer's] failure to provide vasopressors when bradycardia and hypotension w[ere] first encountered caused a delay in addressing [Shronda's] drop in heart rate and blood pressure. Once the decision was made to treat the drop in [Shronda's] heart rate, the dose of atropine provided to [Shronda] at a critical time was below the recommended dose, which resulted in incomplete treatment of her bradycardia. The failure to abort the [colonoscopy] procedure also removed a potential treatment for the drop in [Shronda's] heart rate and blood pressure. Additionally, the record supports a period of sub-standard monitoring, airway management[,] and decision-making by . . . [Shaffer] with gaps in vital signs signaling inadequate oxygen delivery and ventilation over enough time to create a physiologic state of anoxia in [Shronda's] brain

23

tissue. Absent these deviations in the standard of care, more likely than not, [Shronda] would not have suffered an anoxic brain injury.

In determining whether an expert's causation opinion is conclusory, we must remain mindful that expert-report challenges are made at an early, pre-discovery stage in the litigation, not when the merits of the health care liability claim are being presented to the fact finder to determine liability. *Puppala*, 564 S.W.3d at 198. To provide more than a conclusory statement on causation, an expert report must include an "explanation tying the conclusion to the facts" and showing "how and why the breach caused the injury based on the facts presented." *Jelinek*, 328 S.W.3d at 539–40; *see also Puppala*, 564 S.W.3d at 197. The expert report need only provide some basis that the defendant health care provider's act or omission proximately caused injury. *Owens v. Handyside*, 478 S.W.3d 172, 187–88 (Tex. App.—Houston [1st Dist.] 2015, pet. denied); *see also Palacios*, 46 S.W.3d at 879 (explaining "a plaintiff need not present evidence in the report as if [she] were actually litigating the merits. . . . [T]he information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial").

Further, we note that an expert may show causation by explaining a chain of events that begins with the defendant health care provider's alleged negligence and ends in injury to the plaintiff. *See Whitmire*, 2020 WL 4983321, at *16; *Owens*, 478 S.W.3d at 189; *McKellar v. Cervantes*, 367 S.W.3d 478, 485–86 (Tex. App.—

24

Texarkana 2012, no pet.); *see also Christus Spohn Health Sys. Corp. v. Hinojosa*, No. 04-16-00288-CV, 2016 WL 7383819, at *6 (Tex. App.—San Antonio Dec. 21, 2016, no pet.) (mem. op.) (expert report specified signs and symptoms that should have prompted defendant physician to admit patient to hospital for treatment; expert then opined that if patient had been admitted at least two things would have occurred). Further, the description of causation in an expert report need not provide an extreme level of detail to give notice of the basis of the plaintiff's claim. *Wheeler v. Luberger*, No. 14-14-00992-CV, 2016 WL 146008, at *6 (Tex. App.—Houston [14th Dist.] Jan. 12, 2016, no pet.) (mem. op.).

Here, Dr. Reynolds's expert report explains the connection between Shaffer's negligent conduct—his alleged breaches of the standard of care—and the claimed injury, harm, or damages—Shronda's anoxic brain injury. *See THN Physicians Ass'n v. Tiscareno*, 495 S.W.3d 599, 614 (Tex. App.—El Paso 2016, no pet.) ("[T]he expert must at a minimum explain the connection between [defendant's] conduct and the injury to the patient."); *see also Whitmire*, 2020 WL 4983321, at *16; *Owens*, 478 S.W.3d at 189 (expert may show causation by explaining chain of events that begins with defendant physician's negligence and ends in injury to plaintiff); *McKellar*, 367 S.W.3d at 485–86. The correctness of Dr. Reynolds's opinion is not at issue at this stage of the litigation. *See Smith*, 2022 WL 2347744, at *16. Further, Dr. Reynolds's expert report need not marshal all Marquita's proof necessary to

establish causation at trial, and it need not anticipate or rebut all possible defensive theories that may ultimately be presented to the trial court. *See Wright*, 79 S.W.3d at 52; *Cornejo*, 446 S.W.3d at 123; *see also Potts*, 392 S.W.3d at 631–32 ("Summary judgment motions permit trial courts to dispose of claims that lack evidentiary support. But while a full development of all liability theories may be required for pretrial motions or to convince a judge or jury during trial, there is no such requirement at the expert report stage."); *Naderi v. Ratnarajah*, 572 S.W.3d 773, 781–82 (Tex. App.—Houston [14th Dist.] 2019, no pet.) ("To satisfy the how and why requirement, the expert need not prove the entire case or account for every known fact; the report is sufficient if it makes a good-faith effort to explain, factually, how proximate cause is going to be proven." (internal quotations omitted)). It cannot be said that Dr. Reynolds's expert report fails to include an expert opinion on causation as it relates to Shaffer. *See Palacios*, 46 S.W.3d at 878–79 (expert report must include expert's opinion on each element identified in statute—standard of care, breach, and causation); *Smith*, 2022 WL 2347744, at *16.

We conclude that the trial court could have reasonably determined that Dr. Reynolds's expert report represented an "objective good faith effort" to inform Shaffer of the causal relationship between his purported failure to provide care in accord with the standard of care and the claimed injury, harm, or damages. *See Zamarripa*, 526 S.W.3d at 460 (as long as report makes "a good-faith effort to

26

explain, factually, how proximate cause is going to be proven," it satisfies TMLA's threshold requirement); *Kelly v. Rendon*, 255 S.W.3d 665, 679 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (emphasizing expert reports "are simply a preliminary method to show a plaintiff has a viable cause of action that is not frivolous or without expert support"). Thus, we hold that the trial court did not err in overruling appellants' objections and denying appellants' motion to dismiss on the ground that Dr. Reynolds's expert report did not adequately address causation as to Shaffer.

We overrule this portion of appellants' sole issue.

### Epix Medical Services

In the remaining portion of their sole issue, appellants argue that Dr. Reynolds's expert report does not adequately address the standard of care, breach of the standard of care, and causation as to Epix Medical Services because it did not "provide sufficient information for Shaffer," "for whom [Marquita] alleges" that Epix Medical Services is vicariously liable.

In her petition, Marquita alleges that during Shronda's colonoscopy procedure, Shaffer administered anesthesia and Dr. Yarmush supervised Shaffer. Marquita asserts that *both* Shaffer and Dr. Yarmush were employed by Epix Medical Services and Epix Medical Services is vicariously liable for the negligence of *both* Shaffer and Dr. Yarmush, who were acting in the course and scope of their employment at all relevant times.

Generally, when a plaintiff brings health care liability claims against more than one defendant physician or health care provider, the expert report must set forth the standard of care and breach of the standard of care as to each defendant and explain the causal relationship between each defendant's individual acts or omissions and the claimed injury. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a), (r)(6); *Seton Family of Hosps. v. White*, 593 S.W.3d 787, 793 (Tex. App.—Austin 2019, pet. denied); *Pharmacy Healthcare Sols., Ltd. v. Pena*, 530 S.W.3d 169, 175 (Tex. App.—Eastland 2015, pet. denied). Yet, when a plaintiff brings a health care liability claim based on a vicarious liability theory against a defendant health care provider, an expert report that adequately implicates the actions of that party's agent or employee is sufficient. *Gardner v. U.S. Imaging, Inc.*, 274 S.W.3d 669, 671–72 (Tex. 2008); *Seton Family*, 593 S.W.3d at 792; *see also Owens*, 478 S.W.3d at 191 ("[W]hen a health care liability claim involves a vicarious liability theory, either alone or in combination with other theories, an expert report that meets the statutory standards as to the employee is sufficient to implicate the employer's conduct under the vicarious theory." (alteration in original) (internal quotations omitted)). In other words, when a health care liability claim against a defendant health care provider is based on vicarious liability, an expert report that meets the statutory standards as to the defendant health care provider's agent or employee is sufficient to implicate the health care provider's conduct. *See*

28

*Potts*, 392 S.W.3d at 632; *Seton Family*, 593 S.W.3d at 792; *CHCA Clear Lake, L.P. v. Stewart*, No. 01-19-00874-CV, 2021 WL 3412461, at *16 (Tex. App.—Houston [1st Dist.] Aug. 5, 2021, no pet.) (mem. op.); *see, e.g.*, *Ctr. for Neurological Disorders, P.A. v. George*, 261 S.W.3d 285, 295 (Tex. App.—Fort Worth 2008, pet. denied) ("[I]f the expert report is sufficient as to the claims against [employee physician], and we have held that it is[,] . . . then the report is sufficient as to [the] claims against [employer health care provider] that are based on [employee physician's] alleged negligence." (footnote omitted)).

Here, we have held that the trial court did not err in overruling appellants' objections and denying appellants' motion to dismiss Marquita's health care liability claim against Shaffer, an alleged employee of Epix Medical Services, because Dr. Reynolds's expert report represented an "objective good faith effort to comply with the [TMLA's] definition of an expert report" as to him. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l); *Baty*, 543 S.W.3d at 692–93 (internal quotations omitted); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6) ("[e]xpert report" means "a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed" (internal quotations omitted)). Thus, because Marquita may

29

proceed with her health care liability claim against Shaffer, she may also proceed with her vicarious liability health care liability claim against Epix Medical Services based on the conduct of Shaffer. *See Potts*, 392 S.W.3d at 632; *Smith*, 2022 WL 2347744, at \*18–19.

Still yet, we note that Epix Medical Services never challenged Dr. Reynolds's expert report's adequacy concerning Marquita's vicarious liability health care liability claim against Epix Medial Services based on the conduct of Dr. Yarmush. *See* TEX. R. APP. P. 33.1(a); *see, e.g.*, *RGV Healthcare Assocs., Inc. v. Estevis*, 294 S.W.3d 264, 273–74 (Tex. App.—Corpus Christi–Edinburg 2009, pet. denied) (affirming order denying defendant health care provider's objections to expert report related to claims of negligent hiring and supervision where it did not assert in trial court that report was deficient as to that theory). Thus, in overruling appellants' objections and denying their motion to dismiss, the trial court could have concluded that at least one of Marquita's alleged theories—vicarious liability based on the negligent conduct of Dr. Yarmush—had expert support. *See Potts*, 392 S.W.3d at 630–32; *Christus Spohn Health Sys. Corp. v. Johnston*, No. 13-12-00778-CV, 2013 WL 2298471, at \*2–3 (Tex. App.—Corpus Christi–Edinburg May 23, 2013, no pet.) (mem. op.) (appellant did not challenge expert report's adequacy concerning vicarious liability health care liability claim). And Marquita was entitled to have her entire case against Epix Medical Services move forward. *See, e.g.*, *Johnston*, 2013

WL 2298471, at *3; *Huepers v. St. Luke's Episcopal Hosp.*, No. 01-11-00074-CV, 2013 WL 1804470, at *3–5 (Tex. App.—Houston [1st Dist.] Apr. 30, 2013, no pet.) (mem. op.) (holding because hospital waived adequacy of expert report with regard to vicarious liability claim, "[n]o further report was required when [plaintiff's] petition was amended to add a new theory of vicarious liability against [hospital] based upon nursing negligence and the trial court erred in granting [hospital's] motion to dismiss").

Accordingly, we hold that the trial court did not err in overruling appellants' objections and denying appellants' motion to dismiss Marquita's vicarious liability health care liability claims against Epix Medical Services.

We overrule the remaining portion of appellants' sole issue.

## Conclusion

We affirm the order of the trial court.

Kristin Guiney
Justice

Panel consists of Justices Rivas-Molloy, Guiney, and Morgan.